## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 16-009 (TSC)** |
| | : | |
| **v.** | : | |
| | : | |
| **JOSEPH RICKY PARK,** | : | |
| | : | |
| **Defendant.** | : | |

## UNITED STATES OF AMERICA'S OPPOSITION TO
## DEFENDANT'S MOTION TO SUPPRESS

COMES NOW, the United States of America, by and through its attorneys, and files this response in opposition to the defendant's motion to suppress evidence. Docket (hereinafter "D.") 17. For the reasons set forth below, the Court should deny the defendant's motion.

## I.    INTRODUCTION

In his motion, the defendant makes three suppression arguments. First, he seeks to suppress all statements made by him and all physical evidence seized in the case as "fruit of his illegal arrest and as having been seized in violation of the Fourth Amendment to the United States Constitution." D. 17 at 1-2. The defendant does not contest the validity of the arrest warrant or search warrants issued in this case. Rather, he argues that he was "effectively" arrested earlier when he left Vietnam, was then deported from Thailand, and was then refused admittance to the Philippines, and that all statements and evidence should be suppressed as result. *Id*. Next, the defendant argues that the statements he made to law enforcement in Bangkok should also be suppressed because they were taken in violation of *Miranda*. *Id*. at 2. Finally, he seeks to suppress evidence he claims was seized during an unreasonable warrantless search of his apartment in Hanoi, Vietnam. *Id*.

As set forth below, the defendant's arguments fail.  Some evidence was seized pursuant to a proper search incident to a valid arrest by American authorities, and the rest was seized from a third-party pursuant to probable cause.  The audio recording of the defendant's interview clearly demonstrates that the *Miranda* warning was given before the defendant made any statements.  Further, the evidence obtained in Vietnam was not seized from the defendant's apartment.  Finally, there was no illegal arrest, nor was the United States directing the actions by any of the foreign authorities.  For those reasons, his motion should be denied.

## II.   STATEMENT OF FACTS

The defendant's motion depends on the following factual claims:

1.  The United States undertook a concerted effort to have the defendant expelled from Vietnam and forcibly returned to America by acting in concert with Vietnamese authorities "to trick him into leaving Vietnam and travelling to Thailand to attend to immigration issues that were manufactured by the United States." D. 17 at 1, 2;

2.  The United States "caused" Thai officials to arrest the defendant and have him forcibly removed from Thailand and returned to the United States.  *Id*. at 1-3;

3.  Federal agents in the Philippines denied him "the right" to remain in the Philippines and coerced him on to an aircraft bound for Guam, seizing his passport before an arrest warrant was issued. *Id*. at 1, 3;

4.  Federal agents seized his personal effects during a search of the defendant's apartment in Hanoi.  *Id*. at 4.

5.  The statements he made in Bangkok were done prior to the administration of *Miranda* warnings.  *Id*. at 2, 3-4.

As set forth in detail below, each of these factual assertions is incorrect.  The United States proffers that the testimony of federal agents stationed in Vietnam, Thailand, the Philippines, Guam, and the Washington Field Office, and the documentary evidence will establish the following:

*Background*.  In August, 1987, the defendant was convicted in Danbury, Connecticut, of two counts of "Risk of Injury to a Child", Connecticut General Statute (CGS) Section 5.3-21, and one count of "Sexual Assault 2nd Degree". CGS 53a-71. He was sentenced to ten years in prison, to be suspended after seven years, and five years of probation. He was released in 1992 after five years in prison, but an arrest warrant was issued for him in April of 1993 for violating the terms of his probation.  In 1995 the defendant was located in Mexico and was extradited to Connecticut, where he was imprisoned until April of 1998 due to the probation violation.

The last time the defendant was known to be in the United States was in early March of 2003 when he traveled to Cuba.  The same month, he was convicted of corruption of a minor in Cuba and served approximately two years and eight months in prison.  Following his release from prison in Cuba until his arrest in the instant case, the defendant resided in and/or traveled to many countries, including South Korea, Saudi Arabia, the Philippines, and Vietnam.  From May of 2010 through July of 2015, the defendant obtained approximately 13 visas to enter Vietnam, all of which were business visas except for two tourist visas issued in 2012 and one tourist visa issued in July of 2015.

*Vietnam: Initial Investigation and Departure*.  In February of 2015, the U.S. Embassy in Vietnam received an anonymous report from a Vietnamese citizen alleging that the defendant had sexually molested an eleven-year-old Vietnamese boy in Hanoi.  Regional Security Officer Thomas Eckert and Assistant Regional Security Officer Stephen Kaiser ("RSO agents") learned that the complainant was the victim's mother.  On February 12, 2015, they interviewed the victim's mother, who repeated the initial allegations.  The RSO agents began gathering background information on the defendant, including his criminal history and the details surrounding the change of his name in 2009 from Joseph Demasi to Joseph Park.  Near the end

of February, 2015, they reached out to their counterpart with Homeland Security Investigations (HSI) at the U.S. Consulate in Ho Chi Minh City, sharing the information they had gathered so far.  In early March, 2015, HSI Special Agent (SA) Ly Tran spoke with the victim's mother, who again confirmed the allegations.

On March 17, 2015, the RSO agents and SA Tran shared the information they had received with the Vietnamese Ministry of Public Security (MPS).  On March 24, 2015, the HSI Country Attaché sent a routine letter to the MPS requesting that MPS conduct an investigation. The United States did not propose a joint investigation, but did ask to be informed should MPS arrest the defendant, search the defendant's residence, seize any evidence, or deport the defendant.  The letter also asks MPS to secure and document any seized evidence, and to provide that evidence to the United States upon the conclusion of any investigation by MPS.

At that point, the United States held its investigation in abeyance while the Vietnamese government conducted and concluded whatever investigation and action they deemed appropriate.  From the end of March until the end of October, 2015, the American agents in Vietnam took no further steps to investigate the defendant other than to obtain some background information on the defendant and discuss possible ways to resolve the matter.  In those months, the RSO agents attempted to obtain updates from MPS, but little information was forthcoming. At no time did the American agents instruct MPS on how to handle the investigation.

On October 22, 2015, the Chief of the Consular Section at the U.S. Embassy learned from Vietnamese authorities that the defendant was leaving Vietnam, but was not immediately told specifics as to the time, airline, flight number, or destination.  A few minutes later she gathered the flight details, discovering that the defendant was bound for Bangkok. The Embassy was told about the defendant's departure after his plane had taken off.

The next day, MPS sent a diplomatic note to the Embassy indicating that the defendant was asked to leave because he had been impermissibly teaching English in Vietnam while on a tourist visa, and that he agreed to depart the country.  Indeed, as set forth in his motion, the defendant indicates that in July 2015, he was issued a tourist visa instead of a business visa, and then he went to Thailand in October 2015 in order to obtain the correct business visa with the intent to return to Hanoi.  D. 17 at 2.

Critically, neither the RSO agents nor SA Tran knew ahead of time about the change to the defendant's visa, nor that he was leaving the country because he had been impermissibly working while on a tourist visa.[1]  The United States had no input in, nor even advanced knowledge of, whether the defendant would leave Vietnam nor where the defendant would go following his voluntary departure from Vietnam.  With respect to the defendant's departure from Vietnam, in an email dated October 28, 2015, one agent commented that it "[w]ould have been nice had [MPS] told us this was going to happen."

As a final note, the diplomatic note from MPS also indicates that no property was seized from the defendant.

The RSO agents then coordinated with Interpol to determine what would happen if the defendant returned to Vietnam.  They learned from Interpol that the defendant would not be permitted back into Vietnam, and instead would be returned to the country he had traveled from to arrive in Vietnam.

***Thailand: Arrest by Royal Thai Police, Interview by HSI Agents, Photographing of Possessions***.  When the defendant departed Vietnam on October 22, 2015, SA Tran immediately

---

[1] While the agents were told by MPS in October 2015 that the defendant had been working on a tourist visa, they did not know that the defendant's visa had been switched in July of 2015 from a business visa to a tourist visa until they read the defendant's motion to suppress.

contacted HSI Special Agent David Goldman with the U.S. Embassy in Bangkok, who in turn contacted the Royal Thai Police to inform them of the situation. Over the next month, SA Goldman collaborated with the Royal Thai Police's Anti-Trafficking in Persons Division and Immigration Bureau to locate the defendant.  Of note for purposes of this motion, during that month the defendant was not in the custody of the Royal Thai Police nor HSI, and was unrestricted in his movements.  To this point, he stayed at three different hotels over the course of that month.

On October 27, 2015, SA Goldman requested help from the New Haven, Connecticut, HSI Office to obtain documents pertaining to the defendant's conviction, intending to share those documents with the Royal Thai Police.  On November 13, 2015, SA Goldman received the relevant documents.  SA Goldman contacted the Royal Thai Police Immigration Bureau to confirm whether the defendant was still in Thailand.  After receiving such confirmation, on November 23, 2015, HSI Attaché Bryan McPherson in Bangkok sent a letter to the Commissioner of the Royal Thai Police Immigration Bureau advising him of the defendant's Connecticut conviction and providing copies of the documents related to that conviction.   In his letter, Attaché McPherson specifically stated that that he was "providing [the Commissioner] this information for any action [he] deem[ed] appropriate" (emphasis in original).

On November 27, 2015, the Royal Thai Police Immigration Bureau cancelled the defendant's visa pursuant to their authority under Thai law, and then arrested the defendant for being out of status and took him to the Immigration Detention Center pending deportation as an "undesirable."  While the American and Thai agents had been sharing information to locate the defendant, the U.S. Embassy had no involvement in the decision to cancel the defendant's visa, and neither participated in nor was present during his arrest.  In fact, SA Goldman was not

informed of the arrest until after it had taken place.  The defendant was held at the Immigration

Detention Center until he departed Thailand in January 2016.

In accordance with its routine practice and authority, the Immigration Bureau held the

property that had been in the defendant's possession at the time of his arrest.  On December 1,

2015, SA Goldman went to the Immigration Detention Center along with a Foreign Service

National Investigator.  Officers with the Immigration Bureau retrieved the defendant's

possessions and gave permission to SA Goldman to examine the items.  This included a black

bag containing various digital devices.  SA Goldman photographed the bag and the exterior of

the digital devices to document visible serial numbers, but did not search the content of the

digital devices or even turn them on.  Immigration officers were present while SA Goldman took

these photographs.  When he was done, the immigration officers collected all of the defendant's

possessions and put them back into storage.  Although SA Goldman talked to his counterparts in

the Immigration Bureau and Anti-Trafficking in Persons Division about whether they might

obtain a warrant to search the content of the defendant's computer devices, neither agency did

so. The Immigration Bureau also declined a request from SA Goldman to transfer the computer

items to HSI or to leave them in the custody of the flight crew upon the defendant's departure

from Thailand.

***Vietnam: Seizure of Evidence***.  On November 30, 2015, while the defendant was held at

the Immigration Detention Center in Bangkok pending deportation, an American citizen named

David Dutcher contacted the U.S. Embassy in Bangkok.  He stated that he had some of the

defendant's personal property in Hanoi, and that he had seen images of child pornography.  SA

Goldman passed the information on to SA Tran for further inquiry.

On December 2, 2015, SA Tran and RSO Eckert met with Mr. Dutcher at a hotel in Hanoi.  Together, the three walked to Mr. Dutcher's house, where the agents spoke with him and his wife, a legal permanent resident of the United States.  The agents returned the next day to complete the interview.

The Dutchers indicated that they had befriended the defendant in 2011 in Riyadh, Saudi Arabia, and maintained contact with him over the years.  In September of 2015, they traveled to Hanoi and met with the defendant.  They visited the defendant in his apartment several times. The defendant gave them their own key, and invited them to enter his apartment at any time. The Dutchers also gave the defendant a key to their house.

After the defendant left Vietnam in October of 2015, he and Mr. Dutcher remained in contact, primarily via Skype.  At the defendant's direction, Mr. Dutcher went to the defendant's home and retrieved some personal items, including cash and a laptop.  At the defendant's request, on November 5, 2015, Mrs. Dutcher flew to Bangkok with a ticket purchased using the defendant's money to deliver the defendant's personal items to him.  On November 28, 2015, the Dutchers went back to the defendant's apartment at his request to retrieve more personal items, including electronic devices, books, papers, clothes, and suitcases, which they brought back to their home.

Mr. Dutcher believed that the defendant had teaching materials on his electronic devices (both Mr. Dutcher and the defendant taught English).  The defendant had repeatedly told Mr. Dutcher to use his teaching materials at any time.  Accordingly, Mr. Dutcher plugged the defendant's USB hub, containing two flash drives, into his computer.  In reviewing the contents, he saw two videos, one showing a group of prepubescent males with erections, and another showing a nude prepubescent boy.

The Dutchers showed the agents the defendant's items that they were storing on the fourth floor of their home. (Neither SA Tran nor RSO Eckert have ever been to what was the defendant's apartment in Hanoi.)[2] Based on Mr. Dutcher's description of the videos he saw, on December 2, 2015, the agents seized the digital media, to include a Samsung laptop computer, a Hitachi hard drive, an Apple iMac computer, a Seagate external hard drive, a Western Digital hard drive, a Transcend thumb drive, and a Sandisk Cruzer Blade thumb drive (hereinafter the "Vietnam evidence"). The Dutchers were fully cooperative with the agents' collection of the digital media. The agents took the seized items to the U.S. Embassy in Hanoi to label and secure them in RSO Eckert's office. On December 3, 2015, SA Tran retrieved the evidence and transported it to the HSI office in Ho Chi Minh City where it was secured. On December 4, 2015, SA Tran sent the evidence to Special Agent Thomas West at HSI's Cyber Crime Center in northern Virginia. HSI Special Agent Kristina Eyler obtained a search warrant for these items in the District of Columbia.

**_Deportation from Thailand_**. On January 4, 2016, the Immigration Bureau notified the U.S. Embassy that the defendant would be departing Thailand for Guam, by way of the Philippines, on January 7, 2016. HSI had no input on whether or when the defendant would depart, nor where he would go. Under Thai law, individuals who are deported from Thailand must return to their country of citizenship.

On January 5, 2016, SA Goldman returned to the Immigration Detention Center, along with a Deputy Attaché and another Foreign Service National Investigator, to meet with the defendant. SA Goldman identified himself and his colleagues, and told the defendant that they

---

[2] The only agent who has been to the defendant's apartment is ARSO Kaiser, who went there on August 10, 2016, after the defendant had been arrested and new residents had moved in, to take photographs.

wanted to talk to him about his contact with some boys in Vietnam prior to his arrival in Bangkok.  SA Goldman advised the defendant of his *Miranda* rights by reading from a form. The defendant indicated that he understood his rights.  SA Goldman then asked the defendant if he was willing to speak to the agents.  In response, the defendant asked, "Well, you said about boys in Vietnam?"  SA Goldman said yes.  At that point, the defendant indicated he wanted to speak to an attorney, and the interview was immediately terminated.

On January 7, 2016, the defendant was taken by Thai authorities to the international airport to board a flight bound for Manila.  In accordance with their regular practice, immigration officers returned the defendant's possessions to him.  No one from the U.S. Embassy accompanied the defendant during his transport from the Immigration Detention Center to the airport in Bangkok.  SA Goldman went to the airport and observed the defendant emerge from the detention room and pass through security.  He took two photos of the defendant and saw that the defendant was carrying two carry-on bags and had a laptop and a cell phone that appeared to be consistent with the items that had been held at the Immigration Detention Center.  The defendant was not handcuffed when he emerged from the airport detention room.  No federal agent accompanied the defendant on his flight to Manila.

***Transit through the Philippines***.  Immediately after learning on January 4, 2016, that the defendant was leaving Bangkok in three days, SA Goldman began coordinating with his fellow agents in Vietnam, Manila, Guam, and Washington, D.C.  Because the defendant had lived in the Philippines before and had asked Thai immigration officers if he could be deported to the Philippines instead of the United States, SA Goldman was concerned about the possibility that the defendant might try to enter the Philippines instead of flying to Guam as scheduled.

In accordance with established information sharing procedures under a program called *Operation Angel Watch*, HSI Special Agent Steven Sampilo notified Philippine Bureau of Immigration that the defendant was a convicted child sex offender.  On January 7, 2016, SA Sampilo and other HSI investigators and agents watched the defendant disembark the plane from Bangkok and go to the Philippine Bureau of Investigation inspection area instead of the transit lounge.  Because of his prior conviction, Philippine immigration authorities did not permit the defendant to enter the country.  The defendant then went to the transit lounge, refusing to board his connecting flight to Guam.  He remained in the transit lounge until January 14, 2016, and was never admitted into the Philippines.

On January 8, 2016, SA Eyler appeared before U.S. Magistrate Judge Deborah A. Robinson in the District of Columbia to swear out a complaint accusing the defendant of committing illicit sexual conduct with a minor in a foreign country.  D. 1.  Based on that complaint, an arrest warrant was issued for the defendant the same day.  D. 3.  On January 10, 2016, *after* the arrest warrant had been issued for the defendant, SA Sampilo and Deputy Attaché Juan Bortfeld visited the defendant in the transit lounge and seized his U.S. passport, which at the time was being held by Philippine Airlines.  On January 11, 2016, the Regional Security Office with the U.S. Embassy in Bangkok requested that the defendant's U.S. passport be revoked in light of the issuance of the arrest warrant.  The same day, SA Sampilo and Deputy Attaché Bortfeld met with the new Commissioner for Philippine Bureau of Immigration, who unequivocally indicated that he wanted the defendant to continue his journey to Guam at the earliest possible convenience.

On January 12, 2016, the defendant's passport was revoked.  On January 13, 2016, the defendant was indicted in the District of Columbia on one count of violating 18 U.S.C. §

2423(c).  D. 2.  On January 14, 2016, SA Sampilo, Deputy Attaché Bortfeld, along with the Attaché, another Special Agent, and Philippine Airlines security personnel, approached the defendant in the transit lounge and advised him that he must depart the Philippines and board the flight to Guam.  After orally objecting, the defendant ultimately voluntarily boarded the plane, carrying his possessions with him.  No one from HSI or the Philippine authorities physically touched the defendant before or during the boarding process, and he was never handcuffed.  The defendant continued to have access to his personal possessions during the flight.  SA Sampilo and Deputy Attaché Bortfeld accompanied the defendant on the flight to Guam, sitting near him but not next to him.  The flight took place without incident.

*Guam: Arrest, Interview, and Seizure of Evidence*.  Upon arrival at the Antonio B. Won Pat International Airport in Guam around 4 AM on January 15, 2016, SA Sampilo and Deputy Attaché Bortfeld met with HSI Special Agent Richard Flores and HSI Task Force Officer (TFO) Justin Guzman at the entrance of the jetway.  Agent Flores guided Agent Bortfeld, Agent Sampilo, and the defendant to the arrival lounge, where the defendant was informed that he was under arrest by Agents Bortfeld and Flores.  At one point, the defendant was being escorted to a detention room by Regional Agent-in-Charge Shaun Harris and HSI Special Agent Avery Cepeda.  The defendant was not being questioned at the time, but voluntarily stated "All of my crimes were 30 years ago and I've been out of the states for 13 years."

Later that morning SA Flores and SA Cepeda presented the arrest warrant and a Statement of Rights form to the defendant, who read the statement aloud, stated that he understood his rights, and initialed the form.  The defendant then waived his rights by signing the waiver portion of the form, agreeing to be interviewed by SA Flores and SA Cepeda without a

lawyer present.  During the interview, the defendant indicated that he is married but currently separated from his wife, a citizen of South Korea. He claimed not to have any recent contact with her.  The defendant acknowledged that he was deported out of Thailand, but claimed that Thai immigration authorities never told him why he was deported.  The defendant also indicated that he had been removed from Vietnam but stated that he would rather not say why the Vietnamese government asked him to leave.  The defendant declined to provide a list of all the countries he had visited since he last left the United States.  He also declined to say whether he had been deported or removed from any other countries beside Thailand and Vietnam.  The defendant stated that he traveled from Bangkok to Guam with two carry-on bags, specifically, a backpack and computer bag.  At that point, the agents concluded the interview.

All items in the defendant's possession were taken into custody by SA Flores and SA Erwin Fejeran for further processing at the HSI Guam Office.  This included an Apple iPhone, a Samsung laptop, an assortment of SIM cards, passports, a driver's license, and personal documents (hereinafter, the "Guam evidence").  These items were inventoried and secured.  On January 19, 2016, they were sent via registered mail to an evidence custodian at the Department of Justice.  SA Eyler later obtained search warrants for the digital media in the District of Columbia.[3]

Later that day, still on January 15, the defendant was presented in the U.S. District Court of Guam before Magistrate Judge Joaquin Manibusan.  The defendant agreed to waive identity.

---

[3] On January 7, 2016, a Customs Officer with the Guam Customs & Quarantine Agency's Contraband Enforcement Team obtained an anticipatory search warrant from the Superior Court of Guam authorizing the seizure and search of the digital media in the defendant's possession upon his arrival.  This warrant was obtained to ensure the agents had the legal authority to seize the evidence had the defendant arrived in Guam before an arrest warrant was obtained.  Because an arrest warrant had been issued before the defendant's arrival, the Guam search warrant was not executed and was returned to the court.

Magistrate Judge Manibusan remanded the defendant to the custody of the U.S. Marshal Service, who transported the defendant to the District of Columbia.

### III.    ARGUMENT

The defendant's thesis is that he was "tricked" into leaving Vietnam due to fabricated immigration issues, then arrested and forcibly removed from Thailand, and then denied the right to enter the Philippines, all of which constituted an illegal "effective" arrest.  D. 17 at 1.  There is no dispute that the defendant left Vietnam after being caught impermissibly working on a tourist visa, that he was detained in and deported from Thailand, and that he was not permitted to enter the Philippines.  Where the defendant's claim founders is on his assertion that those actions were illegal and that they were brought about by the United States.  Because the defendant arrived in Guam due to the lawful, independent action of foreign governments, his suppression motion should be denied.  The defendant's additional claims that he was not properly *Mirandized* before making a statement and that evidence was seized during an unreasonable search of his home in Hanoi should also be denied as they are simply factually incorrect.

### A.  THE AGENTS LAWFULLY SEIZED ALL EVIDENCE AND PROPERLY ISSUED *MIRANDA* WARNINGS.

To prevail on a motion to suppress evidence as the fruit of a Fourth Amendment violation, a defendant must first establish that the search or seizure was illegal. *United States v. Holmes*, 505 F.3d 1288, 1292 (D.C. Cir. 2007).  Specifically, if a warrant was obtained, the defendant bears the burden of proof.  *United States v. Carhee,* 27 F.3d 1493, 1496 (10th Cir. 1994).  If no warrant is involved, the defendant bears the burden of proving whether and when the Fourth Amendment was implicated.  *Id.*  If that burden is met, the government then bears the burden of proving that its warrantless actions were justified.  *Id.*

With respect to a claim that the defendant was interrogated while in custody in violation of *Miranda*, the government bears the burden of proving by a preponderance of the evidence that the *Miranda* warnings were given or that the defendant intelligently, knowingly and voluntarily waived his *Miranda* rights. *Colorado v. Connelly,* 479 U.S. 157, 168 (1986).

As set forth in more detail below, the Guam evidence was seized incident to an arrest pursuant to a valid arrest warrant. The defendant has failed to meet his burden of establishing that the seizure was unlawful. Further, the United States can establish that the seizure of the Vietnam evidence was reasonable within the meaning of the Fourth Amendment. Finally, the evidence will unequivocally show that the defendant received his *Miranda* rights before he was interrogated, and that the interview was terminated when he invoked his right to speak to an attorney.

1. **The Guam Evidence was Legally Seized Incident to the Defendant's Lawful Arrest.**

It is undisputed that the Guam evidence was seized from the defendant by HSI agents *after* he was arrested in Guam on January 15, 2016, pursuant to a valid arrest warrant issued in the District of Columbia on January 8, 2016. The defendant makes no argument that the arrest warrant lacked sufficient probable cause or was otherwise deficient. Indeed, such a challenge would be baseless, as the complaint accurately sets forth the allegations that the defendant, a twice convicted child sex offender, molested a young Vietnamese boy and produced pornographic images of other boys in Vietnam.

Because the HSI agents in Guam had the uncontested legal authority to arrest the defendant, it necessarily follows that they had the legal authority to seize the personal items in his possession at the time of his arrest. *United States v. Robinson*, 414 U.S. 218, 224 (1973) (it is well settled that a search of the arrestee incident to a lawful arrest is a traditional exception to the

warrant requirement of the Fourth Amendment); *United States v. Williams*, 773 F.3d 98, 104 (D.C. Cir. 2014) (same).  For this reason, the defendant's motion to suppress the Guam evidence should be denied.

### 2.   The Vietnam Evidence was Reasonably Seized Based on Probable Cause.

American agents working abroad are not subject to the Fourth Amendment's warrant requirement.  *United States v. Stokes*, 726 F.3d 880, 890-893 (7th Cir. 2013), *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 157, 167-172 (2d Cir. 2008).  Rather, the question before the Court is whether the seizure was reasonable.  *Stokes,* 726 F.3d at 893, *In re Terrorist Bombings*, 552 F.3d at 171.

In the instant case, the agents' seizure of the evidence from the Dutchers, which was done without any involvement of Vietnamese authorities, was reasonable because it comported with the law that would apply in the United States.  Where, as here, law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, they are permitted to seize the property without a warrant based on the exigencies of the circumstances. *United States v. Place*, 462 U.S. 696, 71 (1983) (collecting cases).  Mr. Dutcher's observations of child pornography on the computer media established probable cause.  The agents were justified in seizing all of the digital evidence because of the likelihood that child pornography could be found on more than one device, and because of the ease with which digital evidence can be altered or destroyed.  Numerous courts have affirmed the warrantless seizure of computers when there was probable cause to believe they contained child pornography in order to avoid destruction or alteration of the evidence.  *See, e.g., United States v. Brown*, 701 F.3d 120, 126-127 (4th Cir. 2012); *United States v. Clutter*, 674 F.3d 980, 985 (8th Cir. 2012).  *See also*, *United States v. Bradley*, 488 Fed.Appx. 99 (6th Cir. 2012) (unpublished); *United States v. Blood*, 429

Fed.Appx. 670 (9th Cir. 2011) (unpublished); *United States v. Diaz*, 435 Fed.Appx. 329 (5th Cir. 2011) (unpublished).  Against the backdrop of this case law, the agents' seizure of the evidence from the Dutchers is clearly reasonable.

In his motion, the defendant argues that the Vietnam evidence must be suppressed because the agents found the evidence when they conducted an unreasonable warrantless search of his apartment.  D. 17 at 4, 6-7.  The fundamental premise of his argument is just patently incorrect.  As noted above, to this day, the two agents who seized the Vietnam evidence have never been to the defendant's apartment.  Rather, they were invited into the Dutcher's home, where they seized the evidence at issue based on probable cause.  Because there was no search of the defendant's home, the defendant's motion to suppress the Vietnam evidence fails.

The defendant's assertion that Mr. Dutcher lacked the authority to consent to seizure of the Vietnam evidence is of no moment.  D. 17 at 7.  To be sure, the Dutchers fully and freely cooperated with SA Tran and RSO Eckert and willingly complied with their collection of the digital media.  While the facts suggest that the Dutchers had the legal authority to consent to the seizure (if not the search) of the digital media, the Court does not need to reach that issue since the evidence was seized pursuant to probable cause.  Further, even if Mr. Dutcher accessed the defendant's apartment, took his computers, and viewed the contents, all without the defendant's permission, this would still not require suppression of the evidence.  It is axiomatic that the Fourth Amendment protects against actions by the government, but that it imposes no warrant requirement on private citizens.  *United States v. Jacobsen*, 466 U.S. 109, 113-114 (1984). While the actions of private citizens may become subject to the Fourth Amendment if the citizen is acting at the behest of the government, *United States v. Ackerman*, 831 F.3d 1292, 1301-1302 (10th Cir. 2016), there can be no such claim here.  The Dutchers could not have been state

actors: HSI had no contact with them—the government did not even know they existed—until after the Dutchers had retrieved the defendant's personal items, examined the computer media, and then called the U.S. Embassy.

### 3. The Defendant Received *Miranda* Warnings Before Making any Statements in Bangkok.

To protect an individual's Fifth Amendment right against self-incrimination, *Miranda* warnings are required when a person in custody is subject to interrogation. *United States v. Straker*, 800 F.3d 570, 613-614 (D.C. Cir. 2015). A defendant may knowingly, intelligently, and voluntarily waive those rights. *North Carolina v. Butler,* 441 U.S. 369, 373 (1979). The defendant argues that the statements he made when interviewed in Bangkok should be suppressed because they were taken before *Miranda* warnings were given. There is no question that the defendant was in custody at the time the interview was conducted. Accordingly, as the audio recording of that interview unequivocally demonstrates, SA Goldman advised the defendant of his *Miranda* rights before the defendant made any statements. When the defendant invoked his right to an attorney, the interview was immediately terminated. Because SA Goldman scrupulously adhered to the requirements of *Miranda*, the defendant's motion to suppress those statements should be denied.[4]

---

[4] The defendant does not seek to suppress any of the statements he made in Guam. Indeed, there would be no basis for doing so. The agents in Guam administered the *Miranda* warnings prior to interviewing the defendant, and the defendant initialed and signed a waiver of rights form. As for the statement he made while being escorted to a room, that was a spontaneous utterance that was not made in response to questioning. *United States v. Sheffield*, 832 F.3d 296, 306 (D.C. Cir. 2016).

### B.  THE DEFENDANT'S "EFFECTIVE" ARREST ARGUMENT IS LEGALLY AND FACTUALLY BASELESS.

Although all of the agents in this case adhered to the demands of American law at all times, as demonstrated above, the defendant nonetheless argues that his statements and all of the seized evidence in the case should be suppressed as the fruit of his illegal arrest.  D. 17 at 1. Specifically, he claims he was effectively and illegally arrested when the United States caused Vietnamese authorities to ask him to leave Vietnam, caused Thai authorities to detain and deport him from Thailand to the United States, and caused Philippine authorities to refuse him entry into the Philippines.  As a result, he argues, all the seized evidence and his statements should be suppressed.  The defendant's novel theory fails both as a matter of law and as a matter of fact.

### 1.  There is No Legal Basis for Suppression.

As set forth in detail throughout this response, the defendant's "illegal arrest" theory has no basis in fact.  Even if it were true, however, that the United States coercively orchestrated the defendant's arrival in Guam, he still would not be entitled to the legal relief he seeks.  For decades, it has been a settled principle that the "power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a forcible abduction."  *Frisbie v. Collins*, 342 U.S. 519, 522 (1952) (quotations omitted).  This is because "due process of law is satisfied when one present in court is convicted of crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will."  *Id*.  Relying on this precedent, the Court of Appeals for the District of Columbia affirmed the conviction of a defendant who was taken into custody by FBI agents in

Nigeria and brought to the United States to stand trial against his will. *United States v. Rezaq*, 134 F.3d 1121, 1126, 1130-1131 (D.C. Cir. 1998).[5]

Against this precedent, the defendant argues that his "arrest" in Vietnam, Thailand, and the Philippines was illegal simply because it was conducted without a warrant. D. 17 at 5. However, as noted above, the warrant requirement does not apply abroad. *Stokes,* 726 F.3d at 893, *In re Terrorist Bombings*, 552 F.3d at 171. Therefore, as a matter of law, the warrantless arrest by an American agent of a U.S. citizen in a foreign country is not *per se* illegal. This is especially so in light of *Frisbie's* acceptance of forcible transit of defendants to the United States.[6]

For that reason, the sole case cited by the defendant in support of his "effective arrest" theory, *Wong Sun v. United States*, 371 U.S. 471 (1963), D. 17 at 2, 5, is inapposite. To be sure, in *Wong Sun*, the Supreme Court found that law enforcement officers had made an unlawful entry and unlawful arrest, 371 U.S. at 479-484, and that the evidence that flowed from those impermissible actions should be suppressed. *Id*. at 484-493. But *Wong Sun* does not establish the essential element to the defendant's theory: that in the eyes of the law he was illegally arrested before he arrived in Guam. Without an illegal arrest, there can be no fruit of the illegal arrest which should be suppressed. As the defendant cannot establish as a matter of law that he

---

[5] There are narrow exceptions to this rule that are inapplicable here, such as torture, brutality, or a treaty governing the extradition of nationals of the foreign country to the United States. *United States v. Rezaq*, 134 F.3d 1121, 1130 (D.C. Cir. 1998).

[6] The defendant's complaint about his warrantless "arrest" is particularly misplaced since, had this taken place in the United States, the victim's allegations would have provided adequate probable cause for an arrest without a warrant. *See, e.g., Clay v. Conlee*, 815 F.2d 1164, 1168 (8th Cir. 1987) (collecting cases). As for when a warrantless foreign arrest by an American agent might be unreasonable, *Frisbie* and its progeny draw the line only at egregious behavior such as torture. The defendant does not come close to alleging such abusive behavior by anyone involved in his investigation.

was illegally arrested, then the Court should deny his motion to suppress his statements and the

seized evidence.

### 2.  The United States did not "Effectively" Conduct an Illegal Arrest of the Defendant.

The defendant's theory that the United States caused its foreign counterparts to illegally

arrest him not only fails legally, it also fails factually.  In general, the Fourth Amendment's

exclusionary rule does not apply to the law enforcement activities of foreign authorities acting in

their own country.  *United States v. Getto*, 729 F.3d 221, 227 (2d Cir. 2012).  There are two

exceptions: if the conduct of the foreign authorities is so extreme as to shock the conscience, or if

the American law enforcement is so involved with the foreign investigation as to constitute a

joint venture.  *Id*. at 228.  Neither is the case here.  Nothing that happened to the defendant was

shocking, nor even illegal under the laws of the country in which it occurred, and the United

States did not cause, much less coerce, such action by the foreign countries.  As such, the

defendant's claim is contrary to the facts, and should be denied.  To be clear, this section focuses

exclusively on the defendant's argument that he was illegally arrested by foreign authorities who

were acting at the direction of the United States.  The legal analysis that follows does not apply

to the seizure of the evidence itself nor to the interview of the defendant, as those were done by

HSI agents acting without any involvement of foreign law enforcement.

*Shock the Conscience*.  Far from shocking the conscience, all of the actions by the

foreign authorities with respect to the defendant were in accordance with their laws.[7]  The

---

[7] In his motion, the defendant is inconsistent as to when his illegal arrest allegedly took place. He first argues that he was arrested when he was tricked into leaving Vietnam.  D. 17 at 1.  Later in his motion, he points to his detention in Thailand as the moment he was arrested.  *Id*. At 5.  It cannot fairly be said that the defendant was effectively arrested at the point of his departure from Vietnam.  All he was required to do was leave Vietnam.  He chose to travel to and remain in Bangkok, where he moved about unrestricted for nearly five weeks.  For that reason, the Court

defendant acknowledges in his motion that he received a Vietnamese tourist visa instead of a business visa in July of 2015.  D. 17 at 2.  It was his choice to violate Vietnamese law for months by impermissibly continuing to work while on a tourist visa, so he can have no complaint about being held accountable for having done so.  The Vietnamese authorities were well within the bounds of reason, as well as their law, when they permitted the defendant voluntarily to exit the country as a result of his undisputed visa violation.

Assuming *arguendo* that Vietnamese immigration authorities failed to comply with every specific mandate of their law, suppression still would not be warranted as their request that the defendant leave the country was not shocking.  Indeed, in the United States, all aliens need a visa in order to work, and can face penalties, including removal, for violating the terms of their visa.  *See*, https://www.uscis.gov/working-united-states/information-employers-employees/information-employers-and-employees (last accessed March 24, 2017).  Without conceding that the defendant was "effectively arrested" simply by being given the option to voluntarily depart the country, there is nothing shocking about his departure as the result of his knowing visa violation.

In Thailand, the defendant was arrested by Thai authorities when they learned about his 1987 conviction for a child sex offense, and was held for just under six weeks until he was deported under Thai law as an "undesirable."  Consistent with Thai law, he was required to return to his country of citizenship.  In the Philippines, he was denied entry, again due to his prior conviction.  In both instances, this is hardly shocking (even if the Thai and Philippine authorities had failed perfectly to comply with their law).  In fact, both countries have policies

---

need not consider the events in Vietnam at all with respect to the defendant's effective arrest theory.  Nonetheless, the United States will discuss them herein.

similar to that of the United States.  *See* 8 U.S.C. § 1182(a)(2)(A)(i) (an alien convicted of a crime of moral turpitude is inadmissible); 8 U.S.C. § 1231(b) (aliens subject to removal may be returned to their country of citizenship); *Efagene v. Holder*, 642 F.3d 918, 922 (10th Cir. 2011) (statutory rape, child abuse, and spousal abuse are considered crimes involving moral turpitude for purposes of Section 1182).  In short, as an American felon, the defendant had no right to remain in or enter Thailand or the Philippines, nor did those countries have an obligation to let him across their borders.  *See Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892) ("[i]t is an accepted maxim of international law that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe.")

Because the Vietnamese, Thai, and Philippine authorities were following their own laws, and because (even if they had not) the laws in the United States would have mandated similar outcomes, their actions are not so extreme as to shock the judicial conscience.  *See United States v. LaChapelle*, 869 F.2d 488, 490 (9th Cir. 1989) (no suppression required when Canadian law enforcement obtained evidence in accordance with their laws, which are similar to those in the United States); *Getto*, 729 F.3d at 228-229 (foreign conduct must be more than illegal, it must be egregious).  Therefore, suppression of the evidence is not warranted.

***Joint Venture***.  Just as there was no illegal or shocking arrest of the defendant, there also was no joint venture between American and foreign law enforcement.  There was no "concerted effort" to "coerce" action by these foreign countries.  As set forth above, the United States agents did nothing more than share information with the relevant foreign country, each of which made their own decision as to how to respond.  Far from driving the action, the United States did not

know about the defendant's departure from Vietnam until it was occurring, and did not know the

full story as to why the defendant left the country until after he filed his motion.  In Thailand, SA

Goldman learned about the defendant's arrest after the fact, and about his impending deportation

after it was planned.  In the Philippines, the United States shared information about the

defendant's criminal history and discussed the situation with the relevant authorities who reached

their own decision that the defendant should leave the country as soon as possible.  Such routine

information sharing does not constitute a joint venture.  *See United States v. Behety*, 32 F.3d 503,

511 (11th Cir. 1994) (sharing information or being present at search insufficient to create a joint

venture) (collecting cases).  As there was no joint venture with respect to the defendant's

departure from Vietnam, deportation from Thailand, and refusal of entry to the Philippines, there

could not have been a joint venture on an illegal arrest that would warrant suppression of the

defendant's statements and evidence seized abroad.[8]

    As noted above, the sole case the defendant cites in support of his suppression argument

is *Wong Sun*.  However, that case does not establish that there was anything egregious, or even

simply impermissible, about the actions of the foreign governments, nor that a joint venture

existed between the United States and three different foreign countries.[9]  In short, *Wong Sun*

provides no basis to suppress the evidence or statements in this case.

---

[8] The defendant does not challenge SA Goldman's photographic inventory of the defendant's
possessions at the Immigration Detention Center, and for good reason, as suppression would not
be warranted.  Setting aside whether a search actually took place, SA Goldman received the
items with the permission of the Thai agents at the Center who allowed him to take the
photographs.  Thus, he reasonably believed that his conduct was permissible.  *United States v.
Peterson*, 812 F.3d 486, 492 (9th Cir. 1987) (suppression not required if American officials have
good faith belief that foreign authorities are complying with their own law).

[9] Even if the defendant's "effective arrest" theory had factual and legal merit, the Vietnam
evidence should not be suppressed because it was identified through an independent source.  *See
supra*, pp. 7-9.  *Murray v. United States*, 487 U.S. 533 (1988) (suppression not required when

## CONCLUSION

For all of these reasons, the defendant's motion to suppress should be denied.

Respectfully submitted,

Steven J. Grocki
Chief
U.S. Department of Justice
Child Exploitation and Obscenity Section


_____/s/_____
Alexandra R. Gelber, Deputy Chief
D.C. Bar 473773
U.S. Department of Justice
Child Exploitation and Obscenity Section
1400 New York Ave. N.W., Suite 600
Washington, DC 20530
Telephone: (202) 307-1316
alexandra.gelber@usdoj.gov


_____/s/_____
Lauren S. Kupersmith, Trial Attorney
U.S. Department of Justice
Child Exploitation and Obscenity Section
1400 New York Ave. N.W., Suite 600
Washington, DC 20530
Telephone: (202) 514-1564
lauren.kupersmith@usdoj.gov

---

evidence initially discovered during, or as a consequence of, an unlawful search, but later
obtained independently from activities untainted by the initial illegality).