**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 16-009 (TSC)** |
| | : | |
| **v.** | : | |
| | : | |
| **JOSEPH RICKY PARK,** | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES OF AMERICA'S OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

COMES NOW, the United States of America, by and through its attorneys, and files this

motion in opposition to defendant's motion to dismiss the indictment.  Docket (hereinafter

"D.") 18.  For the reasons set forth below, the Court should deny the defendant's motion.

**I.    Factual Background**

The Defendant, Joseph Ricky Park (also known as Joseph Demasi), is a United States

Citizen who has taken no steps to renounce his citizenship.  Since the 1980s, he has been

committing child exploitation crimes around the world, including in the United States and has

been either fleeing from or been forced out of other countries as a result of that criminal

behavior.  In 1987, Park was convicted in Connecticut of two counts of "Risk of Injury to a

Child" and one count of "Sexual Assault 2nd Degree."  He was released in 1992 after five years

in prison, but an arrest warrant was issued in April 1993 for violating the terms of his probation.

In 1995, Park was located in Mexico and was extradited to Connecticut, where he was

imprisoned until April of 1998 due to the probation violation.  On or about March 2003, he

travelled from the United States to Cuba where he was arrested and incarcerated for "Corruption

of a Minor" that same month.  He served approximately two years and eight months in prison in Cuba.

From his release in Cuba until his arrest in the instant case, Park resided in and/or traveled to several countries, including Korea, Philippines, Thailand, Russia, Kuwait, China, Vietnam, Laos, Singapore, Malaysia, Saudi Arabia, Bahrain, Lebanon, and Cambodia.  In January 2009, South Korean authorities revoked his visa and ordered him to leave the country after learning of his prior sex abuse conviction and receiving information that he displayed indecent behavior while working as a schoolteacher in South Korea.  After departing South Korea in January 2009, he attempted to re-enter the country one month later and was arrested. Later that month, he was voluntarily removed to the Philippines.  In the middle of 2013, Park was asked to leave Saudi Arabia because of his "pedophile" behavior, at which point he went to Vietnam.

Defendant states that he has resided in Vietnam from at least 2012 until his arrest in this case, but that is an oversimplification of his migratory lifestyle demonstrated by the use of his U.S. Passport in a variety of countries. D. 18 at 1.  In September 2012, Park applied for additional visa pages for his U.S. passport, stating that he planned to travel for an indefinite period of time to, among other places, Vietnam.  From 2012 through 2015, Park was issued three 30 day tourist visas for Vietnam and five 90 day business visas for Vietnam.  In between, he also made multiple trips to Thailand, Cambodia, and Philippines.

Around January 2015, while in Vietnam, Park invited a Vietnamese juvenile, 11 years old at the time, to his apartment for additional English language instruction.  The young boy and two of his friends met Park at his apartment.  While the boys played video games, Park placed his hand on the victim's genitals and then proceeded to "pinch" and stroke the victim's genitals

through the victim's clothing.  Park then attempted to place his hand inside the victim's pants, but the victim pushed Park's hand away.

In October 2015, Park was asked to leave Vietnam because he had been impermissibly teaching English in Vietnam while on a tourist visa.  Park agreed to depart the country and he went to Thailand.  Around this time, Park directed a friend who had access to his apartment to go to the upstairs bedroom, locate Park's jacket, and remove approximately $1,000.00 U.S. Dollars and Vietnam Dong from the chest pocket.  Park directed this friend to use the money to purchase a plane ticket to Thailand and to bring a laptop, bank card, bank documents, vitamins, and leftover money to him in Thailand.  A few weeks later, Park directed this same friend to retrieve Park's remaining personal belongings from Park's Vietnam apartment and transport them to the friend's house.  These belongings included various computer media devices.  A search warrant for these items was issued in the District of Columbia and a forensic review of the media devices later revealed evidence of production of child pornography of unidentified victims from July 2013 through August 2015.[1]

At all times, Park was a United States citizen who maintained his ties to the United States.  Park maintained two United States passports: one under the name Joseph Ricky Park, which had been issued on January 27, 2010 with an expiration date of January 26, 2020 (Attachment 1), and another under the name Joseph Ricky De Masi, which had been issued on July 24, 2007 with an expiration date of July 23, 2017 (Attachment 2).  Both passports list a place of birth as New York, U.S.A.  Beyond his passports, Park maintained several other documents which indicated his ties to the United States, and his residency in places in the United

---

[1] The charges in this case, as they relate to the actual and attempted production of child pornography, are only based on images produced after May 30, 2015, which is when the statute was amended to include production of child pornography.  *See infra*, § II.c.  *See also* United States of America's Consolidated Response to Defendant's Motions for a Bill of Particulars and For an Extension, filed contemporaneously herewith.

States.  Park maintained a New York State Driver License under the name Joseph R. Demasi, which had been issued on September 10, 2008 with an expiration date of May 12, 2017 and an address in Woodside, New York, New York (Attachment 3).  Park had an International Driving Permit, issued in Heathrow, Florida, dated June 1, 2012 under the name Joseph Demasi, which listed a permanent address as Woodside, New York (Attachment 4).  On his VAT Refund Application for Tourist in November 2015, Park listed his permanent/mailing address as an address in Las Vegas, Nevada (Attachment 5).  Park also maintained a Report and Certificate of Marriage from the U.S. Embassy in Seoul, Korea, dated January 6, 2009, under the name Joseph Ricky De Masi.  On that form, Park listed his permanent address as a post office box in Miami, Florida (Attachment 6).  There is no indication that Park ever sought to obtain permanent status in another country.

**II.     Background of Title 18, United States Code, Section 2423(c)**

**a.  PROTECT ACT**

Title 18, United States Code, § 2423(c) was added to the United States Code as part of the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act of 2003 ("PROTECT Act"), Pub. L. No. 108-21, 117 Stat. 650 (2003).  This provision, entitled "Engaging in Illicit Sexual Conduct in Foreign Places," provided criminal penalties for "[a]ny United States citizen or alien admitted for permanent residence who travels in foreign commerce, and engages in any illicit sexual conduct with another person."  The phrase "illicit sexual conduct" was defined in 18 U.S.C. § 2423(f) as "(1) a sexual act (as defined in section 2246) with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States; or

 (2) any commercial sex act (as defined in section 1591) with a person under 18 years

of age."

This statutory provision, which became effective on April 30, 2003, was first proposed one year earlier in the 107th Congress as one part of a broader set of amendments to 18 U.S.C. § 2423, in legislation entitled the "Sex Tourism Prohibition Improvement Act of 2002." H.R. Rep. No. 525, 107th Cong. 2nd Sess. 2002. The House Report accompanying that bill stated that the purpose of the entire bill was to "address a number of problems related to persons who travel to foreign countries and engage in illicit sexual relations with minors." H.R. Rep. No. 107-525, June 24, 2002.

The Report further noted:

> Current law requires the Government to prove that the defendant traveled to a foreign country with the intent to engage in sex with a minor. H.R. 4477 eliminates the intent requirement where the defendant completes the travel and actually engages in illicit sexual activity with a minor . . . This legislation will close significant loopholes in the law that persons who travel to foreign countries seeking sex with children are currently using to their advantage in order to avoid prosecution.

*Id.* With respect to the need for the legislation, the Report stated, "[m]any developing countries have fallen prey to the serious problem of international sex tourism." *Id.* The Report went on to state that the proposed statute would be unnecessary if foreign countries had the resources and effective law enforcement necessary to prosecute "U.S. citizens or resident aliens" for sex crimes with children committed within their borders. *Id.* The Report further stated that because such individuals often escape prosecution in these foreign countries, the United States has a significant interest in pursuing charges against these crimes in the United States. *Id.* The Report specifically observed that "[b]y and large these countries reach out to the United States for help and some even blame the United States for the problem, arguing that many of the sex tourists are

American." *See* H.R. Rep. No. 107-525, June 24, 2002.  Finally, the Report identified Art. I, § 8, of the United States Constitution, as the authority for the proposed legislation.  *See id.*

Although the above-referenced proposed legislation passed the House of Representatives, it did not pass the Senate.  As a result, what became § 2423(c) in 2003 was reintroduced in the 108th Congress and was ultimately adopted as part of the PROTECT Act. The Conference Report for the PROTECT Act states that the purpose for § 2423(c) is to "address[ ] a number of problems related to persons who travel to foreign countries and engage in illicit sexual relations with minors.  Current law requires the government to prove that the defendant traveled with the intent to engage in the illegal activity.  Under this section, the government would only have to prove that the defendant engaged in illicit sexual conduct with a minor while in a foreign country."  H.R. Conf. Rep. 108-66, 108th Cong. 1st Sess. 2003, reprinted in 2003 U.S.C.C.A.N. 683, 686.  The 108th Congress specifically referenced the earlier "Sex Tourism Prohibition Improvement Act of 2002" and recognized that it "passed the House by 418 yeas to 8 nays on June 26, 2002."  *Id.*  The language of 2423(c) passed by the 108th Congress was identical to that proposed one year earlier, except that the 108th Congress included a maximum penalty of 30 years, whereas the 2002 legislation proposed a maximum penalty of 15 years.  *Compare* H.R. Conf. Rep. 108-66 *with* H.R. Rep. No. 107-525.

### b.  VIOLENCE AGAINST WOMEN REAUTHORIZATION ACT OF 2013

As part of the Violence Against Women Reauthorization Act of 2013 ("VAWA"), Congress expanded the extraterritorial child sexual exploitation provisions of 18 U.S.C. § 2423(c) to reach U.S. Citizens who temporarily or permanently reside overseas.  VAWA added the underlined text to § 2423(c), to allow for the prosecution of: "[a]ny United States citizen or alien admitted for permanent residence who travels in foreign commerce or resides, either

temporarily or permanently, in a foreign country, and engages in any illicit sexual conduct with another person."  Violence Against Women Reauthorization Act of 2013, Pub. L. No.113-4, 127 Stat. 54 (2013).[2]  This provision took immediate effect on March 7, 2013.  The definition of "illicit sexual conduct" contained in § 2423(f) remained unchanged until 2015, as discussed below.

The proposed amendment to § 2423(c) to apply to United States citizens residing abroad was first considered by the 112th Congress in the Trafficking Victims Protection Reauthorization Act (TVPRA) of 2011.  S. 1301, 112th Cong. Title II § 201(b).  The language proposed in TVPRA for § 2423(c) is identical to the language ultimately adopted for § 2423(c) by VAWA.  S. Rep. No. 112-96, at 48 (2011).  TVPRA was sponsored by Senator Patrick Leahy (D-VT) and introduced to the Senate on June 29, 2011.  *Id.*  While introducing the bill on the Senate floor, Senator Leahy noted that the purpose of the bill was "to combat human trafficking both abroad and at home."  157 CONG. REC. S4228 (2011).

In a Session Report regarding the Trafficking Victims Protection Reauthorization Act of 2011, a Senate Committee on the Judiciary report noted that the bill "acknowledge[d] the need to address the massive scale of global trafficking and the fact that much domestic trafficking has roots in international trafficking rings."  S. Rep. No. 112-96, at 6 (2011).  Additionally, the report stated that the goal of the bill was to "combat the scourge of human trafficking in the United States and around the world."  *Id.* at 18 (emphasis added).  Specifically referencing the relevant change to § 2423(c), the report noted that § 2423 was "strengthened to hold criminally liable those U.S. citizens and lawful permanent residents residing outside of the United States

---

[2] Defendant cites to H.R. 898-113th Congress (2013-2014), which is the Trafficking Victims Protection Reauthorization Act of 2013, which would have amended the statute differently, but was not passed.  D. 18, at 3.

who engage in illicit sexual conduct with a minor.  Current law only reaches U.S. citizens and lawful permanent residents who travel abroad in foreign commerce."  *Id.* at 8.

While the language first appeared in the TVPRA, it was not officially passed by Congress until the 113rd Congress considered and passed VAWA.  The initial language of the VAWA did not include the extension clause, but it was ultimately incorporated by Senate Amendment No. 21, which was introduced by Senator Leahy.  159 Cong. Rec. S601 (2013).  Senate Amendment No. 21 contained the same essential elements contained within the TVPRA and was passed by a near-unanimous Senate, 93-5.  *Id.* at 609-10.

### c.  JUSTICE FOR VICTIMS OF TRAFFICKING ACT OF 2015

As part of the Justice for Victims of Trafficking Act of 2015, Congress further amended the "sex tourism" statute by adding an additional definition of "illicit sexual conduct" in § 2423(f).  Under 18 U.S.C. § 2423, "illicit sexual conduct" now includes "production of child pornography (as defined in section 2256(8))," in addition to sexual acts (as defined in section 2246) or any commercial sex act (as defined in section 1591).[3]  Justice for Victims of Trafficking Act of 2015, Publ. L. No. 114-22, 129 Stat. 240 (2015).  This amendment was made in the section of the Act titled "Targeting Child Predators" with the heading "Clarifying That Child Pornography Producers are Human Traffickers."  This provision took immediate effect on May 29, 2015.

### d.  Overall

The elements of the revised statute are thus:

> 1.  the defendant is a United States Citizen or permanent resident;

---

[3] The Justice for Victims of Trafficking Act (JVTA) also amended the affirmative defense set forth in 18 U.S.C. § 2423(g) which allows a defendant to prove he reasonably believed the person with whom the defendant engaged in a commercial sex act had attained the age of 18 years.  The JVTA changed the burden of proof from the preponderance of the evidence to clear and convincing evidence.  Publ. L. No. 114-22, 129 Stat. 240 at sec. 111.

    2.   who travels in foreign commerce or resides, either temporarily or

          permanently, in a foreign country; and

    3.   engages in illicit sexual conduct.

"Illicit sexual conduct" includes a sexual act with a person under 18 years of age that would be illegal under chapter 109A (if the act took place in the special maritime or territorial jurisdiction of the United States), a commercial sex act (as defined by 18 U.S.C. § 1591) with a person under 18 years of age or, after May 2015, production of child pornography (as defined in § 2256(8)).  With respect to the second element, in this case, the indictment does not allege that the defendant traveled in foreign commerce, but rather is limited to an allegation that Park temporarily and permanently resided abroad.  D. 2.

## III.    Standard of Review

A motion to dismiss an indictment "is granted only in unusual circumstances." *United States v. Ballestas*, 795 F.3d 138, 148 (D.C. Cir. 2015) ("[b]ecause a court's use of its supervisory power to dismiss an indictment directly encroaches upon the fundamental role of the grand jury") (internal quotations omitted).  An indictment need only contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c).  When considering a motion to dismiss an indictment, a court assumes the truth of the government's factual allegations.  *Ballestas*, 795 F.3d at 149 (citing *Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n. 16 (1952)).

Acts of Congress are presumed to be constitutional.  *See, e.g., Munn v. Illinois*, 94 U.S. 113, 123 (1876).  Accordingly, "[t]he courts ought not to declare one to be unconstitutional, unless it is clearly so.  If there is doubt, the expressed will of the legislature should be sustained." *Id.*  Acts of Congress will be invalidated only upon a plain showing that Congress has exceeded

its constitutional bounds.  *United States v. Five Gambling Devices*, 346 U.S. 441, 449 (1953).  A

facial challenge to a statute is "the most difficult challenge to mount successfully, since the

challenger must establish that no set of circumstances exists under which the Act would be

valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987) (noting that a facial challenge is the

"most difficult challenge to mount successfully"); *Wash. State Grange v. Wash. State Republican

Party*, 552 U.S. 442, 449 (2008); *Bahlul v. United States*, 840 F.3d 757, 798-99 (D.C. Cir. 2016),

reh'g denied (Nov. 28, 2016).  Thus, courts must exercise caution and reluctance before striking

down a statute.  *See Parker v. Levy*, 417 U.S. 733, 760 (1974) (holding that courts must be

"reluctant[ ] to strike down a statute on its face where there [are] a substantial number of

situations to which it might validly be applied."); *Erznoznik v. City of Jacksonville*, 422 U.S.

205, 216 (1975) (emphasizing caution before striking down statute as facially unconstitutional);

*United States v. Bodye*, 172 F. Supp. 3d 15, 21 (D.D.C. 2016) ("There is a fundamental principle,

moreover, 'that an act of Congress is not to be declared invalid except for reasons so clear and

satisfactory as to leave no doubt of its unconstitutionality.'") (quoting *El Paso & N.E. Ry. Co. v.

Gutierrez*, 215 U.S. 87, 96 (1909)).

     Further, when evaluating whether a law is facially valid, courts "must be careful not to go

beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary'

cases."  *Wash. State Grange*, 552 U.S. at 449-50 (citing *United States v. Raines*, 362 U.S. 17, 22

(1960) ("The delicate power of pronouncing an Act of Congress unconstitutional is not to be

exercised with reference to hypothetical cases thus imagined.")).  As such, defendant's claim that

the statute is overbroad due to a hypothetical United States citizen born abroad is improper.  *See

Bahlul*, 840 F.3d at 798 (citing *Schall v. Martin*, 467 U.S. 253, 268 n. 18 ("[O]utside the limited

First Amendment context, a criminal statute may not be attacked as overbroad.")).

## IV.    Argument

Congress has the authority to enact laws that extend beyond the territorial boundaries of the United States.  18 U.S.C. § 2423(c) is a valid exercise of Congress's broad powers under the Foreign Commerce Clause because, in part, it regulates activities that substantially or demonstrably affect foreign commerce.  Additionally, § 2423(c) is constitutionally sound because it is necessary and proper to the implementation of the international treaty obligations of the United States.  Further, because § 2423(c) criminalizes the extraterritorial acts of United States nationals, it is within Congress's constitutional power over citizens and foreign affairs.  Section 2423(c) does not violate the Due Process Clause of the Fifth Amendment, nor does application of the amended statute to Defendant's actions in 2015 create an ex post facto problem.

### a.   18 U.S.C. § 2423(c) is Constitutional Under the Foreign Commerce Clause.

The Constitution authorizes Congress "to regulate Commerce with foreign Nations, and among the several States and with the Indian Tribes."  *See* U.S. Const. art. I, § 8, cl. 3.  The Supreme Court has stated that Congress's power under the Foreign Commerce Clause is even more expansive than its power to regulate interstate commerce.  *See Japan Line, Ltd. V. Los Angeles County*, 441 U.S. 434, 448 n. 13 (1979) (opining that the Founders intended the scope of the foreign commerce power to be greater than the power to regulate domestic commerce).  In fact, the Supreme Court has never struck down an act of Congress as exceeding its powers to regulate foreign commerce.

The Necessary and Proper Clause allows Congress to "make all Laws which shall be necessary and proper for carrying into Execution the [enumerated] Powers, and all other Powers vested" by the Constitution.  U.S. Const. art. 1, § 8, cl. 18.  To determine whether Congress's

exercise of its legislative power is supported by the Necessary and Proper Clause, courts must determine "whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." *United States v. Comstock*, 560 U.S. 126, 133 (2010). Under the rational relationship test, a provision need not be "absolutely necessary" to the exercise of a constitutional power, but instead, legislative power includes the power to enact laws that are "convenient, or useful' or conducive' to the authority's beneficial exercise." *Id.* (citations omitted).

In the context of interstate, domestic commerce, the test for whether legislation bears a rational relationship to Congress's commerce power is further assessed by whether the regulated activity falls under three broad categories of activity subject to regulation by Congress: (1) the use of the channels of interstate commerce, (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce, and (3) activities that substantially affect interstate commerce. *See United States v. Lopez*, 514 U.S. 549, 558-59 (1995) (citations omitted); *see also United States v. Morrison*, 529 U.S. 598, 608-09 (2000). While the *Lopez* framework is helpful to the Foreign Commerce Clause analysis, courts have held that "when regulating foreign commerce, Congress's authority is not constrained by the three categories in the *Lopez/Morrison* framework." *United States v. Martinez*, 599 F.Supp.2d 784, 805 (W.D. Tex. 2009) (citing *United States v. Clark*, 435 F.3d 1100, 1103 (9th Cir. 2006)). This is because, to the extent there have been any limitations placed on Congress's regulation of domestic, interstate commerce, such boundaries were primarily developed in response to federalism concerns and the need to balance state and federal authority. *See Lopez*, 514 U.S. at 580. "[I]t has never been suggested that Congress' power to limit Foreign Commerce could be so limited." *Clark*, 435 F.3d at 1103 (quoting *Japan Line*, 441 U.S. at 448 n.13); *see also United States v. Bollinger*, 798 F.3d 201,

210 (4th Cir. 2015) (rejecting the argument that the Supreme Court's interstate jurisprudence should be wholly transposed into the foreign context because of "decades of Supreme Court cases that have consistently interpreted Congress's interstate authority against the backdrop of, and as constrained by, federalism concerns that are inapposite in the international arena.").

The Supreme Court has repeatedly rejected the idea that foreign interests place any limit on Congress's power to regulate foreign commerce. *See Japan Line*, 441 U.S. at 448 n.13; *see also Bd. of Trustees of Univ. of Ill. v. United States*, 289 U.S. 48, 57 (1933) ("[T]he principle of duality in our system of government does not touch the authority of the Congress in the regulation of foreign commerce."); *United States v. Clark*, 435 F.3d 1100, 1113 (9th Cir. 2006) ("There is no counterpart to *Lopez* or *Morrison* in the foreign commerce realm that would signal a retreat from the Court's expansive reading of the Foreign Commerce Clause."). This Court should therefore evaluate the constitutionality of § 2423(c) in the context of Congress's broad power to regulate foreign commerce, not the more stringent context of the interstate commerce power.

To be sure, the Defendant's travel *from* the United States to a foreign country was before the enactment of the criminal statute and the instant charged conduct. However, his actions as a United States citizen who used his United States passport to travel among many countries, who resided in several foreign nations, and who sexually victimized children in those countries, affected foreign commerce and should be evaluated in light of Congress's broad foreign commerce power.[4] Cases addressing Foreign Commerce Clause challenges to the original

---

[4] Given Park's travel to at least fifteen countries on a variety of temporary visas since he left the United States, his declaration in his application for additional pages for his U.S. passport in 2012 that he planned to travel for an indefinite period of time, and his lack of effort to gain permanent status in another country, Park arguably could be charged under the travel prong of 18 U.S.C. § 2423(c). *United States v. Schmidt*, 845 F.3d 153, 157 (4th Cir. 2017) ("A person may still be traveling even after a significant amount of time in a given location so long as the visit is sufficiently transient or contemplates some future departure. Travel can thus continue until a party either returns to

version of § 2423(c) provide meaningful insight with respect to the Defendant's current challenge to the constitutionality of the amended statute.  Courts have consistently held that the prior version of § 2423(c) was constitutional and within the foreign commerce powers of Congress.  Courts, however, have not taken a uniform approach in upholding the statute; rather, they have relied on analytical frameworks including whether the activity regulated has a substantial effect on foreign commerce (similar to the third prong in *Lopez*) and whether the activity regulated has a demonstrable effect on foreign commerce (a broader approach than *Lopez*).  Those same frameworks can be applied to support the constitutionality of the statute as amended.

### 1.  *Substantial Effect on Foreign Commerce*

Defendant places great emphasis on his noncommercial activity and that § 2423(c) cannot be upheld on the theory that it is regulating an activity that has substantial effects on foreign commerce because his acts "did not affect foreign commerce."  D. 18, at 13-14.  (The years Park spent hopscotching around the globe on his U.S. passport belies any claim that his actions had no impact on foreign commerce.)  However, the substantial effects approach was adopted by several courts considering the constitutionality of the prior version of § 2423(c) as applied to non-commercial sex acts.  *See, e.g., United States v. Martinez*, 599 F. Supp. 2d 784, 808 (W.D. Tex. 2009).  The court in *Martinez* emphasized Congress's broad powers under the Foreign Commerce Clause early in the opinion.  *Id*. at 805 ("[t]he Supreme Court has never struck down an act of Congress as exceeding its powers to regulate foreign commerce") (quoting *Clark*, 435 F.3d at 1113).  In addition to emphasizing Congress's broad foreign commerce powers, the *Martinez* court reasoned that the modern Interstate Commerce Clause framework

---

his or her place of origin or permanently resettles elsewhere.") (internal citations omitted); *see also United States v. Jackson*, 480 F.3d 1014, 1022-1024 (9th Cir. 2007).

(*Lopez/Morrison*) is helpful but not controlling when analyzing a Foreign Commerce Clause

case.  *Id*. at 804-05 (noting that *Lopez/Morrison* frameworks are "a relevant starting point " but

that "when regulating foreign commerce, Congress's authority is not constrained by the three

categories in the *Lopez/Morrison* framework.").  The *Martinez* court went on to find that "similar

to *Raich*, there is a rational basis for concluding that leaving non-commercial sex with minors

outside of federal control could affect the price for child prostitution services and other market

conditions in the child prostitution industry."  *Id*. at 808 (citing *Gonzales v. Raich*, 545 U.S. 1, 19

(2005)).  Thus, the court upheld the constitutionality of § 2423(c) when applied to non-

commercial sex because of its relation to the broader scheme of regulation aimed at the

"quintessentially economic" world market that exists for child prostitution.  *Martinez*, 599 F.

Supp. 2d at 808; *see also United States v. Bianchi*, 386 Fed. Appx. 156, 162 (3d Cir. 2010)

(unpublished) (upholding § 2423(c)'s non-commercial prong in an unpublished opinion

following *Martinez* and noting that the appellant had not "even attempted to persuade us that

Congress did not have a rational basis for believing" that regulating the non-commercial sexual

abuse of minors would strengthen the regulation of commercial sexual abuse).

     The Supreme Court case, *Gonzales v. Raich*, 545 U.S. 1, 19 (2005), referenced in

*Martinez* is instructive on its own.  Utilizing the third "substantially affect interstate commerce"

prong of *Lopez/Morrison*, the *Raich* court reasoned that even the purely intrastate activity of

cultivating marijuana could be regulated, because Congress had a rational basis for believing that

the intrastate cultivation of marijuana substantially affected the interstate market for marijuana.

*See Gonzales v. Raich*, 545 U.S. 1, 19 (2005).  As in *Raich*, the market for sex acts with children

is an "unlawful market that Congress sought to eradicate."  *Raich*, 545 U.S. at 19.  Congress

enacted § 2423(c) and expanded it through the new residency provisions because of a rational

belief that when United States citizens who reside abroad commit sex acts with minors, it substantially affects the global market for sex acts committed against minors. *See* supra § II.b. As explained by the Court in *Raich*, such regulation of non-commercial, local activity furthers the "federal interest in eliminating commercial transactions in the interstate market in their entirety." *Raich*, 545 U.S. at 19. Congress, therefore, can regulate activity that is not itself commercial where such activity is part of a class of activities that is within the reach of federal power. *United States v. Hardeman*, No. CR 10-0859 RS, 2011 WL 13143962, at *8 (N.D. Cal. July 20, 2011) ("Congress's interest in regulating non-economic sex crimes against children abroad is, in short, similar to its interest in regulating locally grown and consumed marijuana in *Raich*. . . The Protect Act, in other words, seeks to prohibit the commercial, sexual exploitation of children abroad, and it makes sense that a failure to regulate one particular iteration—the non-economic sex crime—of this activity would undermine that effort.").

Similarly, Congress can regulate activity that is conducted entirely overseas where such activity is part of a class of activities that has a substantial effect on foreign commerce. *See United States v. Bodye*, 172 F. Supp. 3d 15, 23 (D.D.C. 2016) ("Keeping drugs off [U.S.-registered] planes at all times is therefore a rational means of stopping drugs from moving into and out of the United States. To be sure, the ban will cover some instances in which neither the plane nor the drugs were actually destined for the United States, but this prophylaxis is rational.") (quoting *Westfall v. United States*, 274 U.S. 256, 259 (1927) ("[W]hen it is necessary in order to prevent an evil to make the law embrace more than the precise thing to be prevented [Congress] may do so.") (alteration in original); *Raich*, 545 U.S. at 22 ("That the regulation [of marijuana manufacture and possession] ensnares some purely intrastate activity is of no moment. As we have done many times before, we refuse to excise individual components of that larger

scheme.") (alteration in original)).  *See also United States v. Baston*, 818 F.3d 651, 667-668

(11th Cir. 2016) (holding 18 U.S.C. § 1596(a)(2) is constitutional under the Foreign Commerce

Clause because "nothing in the Foreign Commerce Clause limits Congress's authority to enact

extraterritorial criminal laws" and "Congress had a 'rational basis' to conclude that such [sex

trafficking] conduct—even when it occurs exclusively overseas—is 'part of an economic 'class

of activities' that have a substantial effect on . . . commerce' between the United States and

other countries.") (citing *Raich*, 545 U.S. at 17, 19).  Congress had a rational basis to conclude

that U.S. citizens residing abroad and engaging in illicit sexual conduct is part of a "class of

activities" that have a substantial effect on foreign commerce.

### 2.   *Demonstrable Effect on Foreign Commerce*

In *United States v. Bollinger*, 798 F.3d 201 (2015), the Fourth Circuit found that the

"substantially affects interstate commerce" factor of *Lopez/Morrison* is unduly demanding in the

foreign context, and instead held that "the Foreign Commerce Clause allows Congress to

regulate activities that demonstrably affect such commerce."  *Id.* at 215-216.  "It is eminently

rational to believe that prohibiting the non-commercial sexual abuse of children by Americans

abroad has a demonstrable effect on sex tourism and the commercial sex industry."  *Id.* at 218.

Citing the legislative history which highlighted the sexual exploitation of children ignored in

developing countries because of the money brought in; the removal of the intent requirement in

the prior statute; the international treaty aimed at eliminating the sale of children, child

prostitution, and child pornography (*see* infra § IV.b); and the larger regulatory scheme designed

to close loopholes that facilitated abuse of children abroad, the Fourth Circuit held that 2423(c)

was constitutional under the Foreign Commerce Clause.  *Id.* at 218-219.  *See also United States*

*v. Pendleton*, 658 F.3d 299, 310 (3d Cir. 2011) *cert. denied*, 132 S. Ct. 2771 (2012)

("Specifically, Congress found that American citizens were using the channels of foreign commerce to travel to countries where 'dire poverty and . . . lax enforcement' would allow them to 'escape prosecution' for their crimes of child sexual abuse.") (quoting 148 Cong. Rec. 3884 (2002)).

While *Bollinger* and the other cases evaluating § 2423(c) under the substantial or demonstrable effect on foreign commerce prong all came before the 2013 resident amendment to § 2423(c), foreign residency and sexually exploiting children while residing abroad is sufficiently intertwined with foreign commerce. Both the commercial and non-commercial activities covered by the statute further the federal interest in eliminating the market for international sexual exploitation of minors. This is particularly true when the offense involves production of child pornography, the product of which could at any point in time become an eternal component of the market for international sexual exploitation of minors. Under *Raich* and other controlling precedent, courts assessing the scope of Congress's authority under the commerce clause "need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." 525 U.S. at 22. Congress here had a rational basis for concluding that the activities of multiple United States citizens who reside overseas and engage in the commercial and non-commercial sexual exploitation of minors affect foreign commerce. The Fourth Circuit's cautionary language about a world without § 2423(c) is equally applicable to the statute post-2013:

> Finally, it is worthwhile to briefly consider the consequence of a contrary holding that Section 2423(c) is unconstitutional. In that case, a citizen could effectively avoid all police power by leaving U.S. soil and traveling to [and residing in] a nation with weak or non-existent sexual abuse laws. The citizen would be free to act with impunity—a reality that could undoubtedly have broad

> ramifications on our standing in the world, potentially disrupting diplomatic and even commercial relationships. Of course, the Tenth Amendment reserves unenumerated powers to the states and the people. But the Constitution does not envision or condone a vacuum of all police power, state and federal, within which citizens may commit acts abroad that would clearly be crimes if committed at home.

*Bollinger*, 798 F.3d at 219.  Failure to regulate the non-commercial sexual exploitation by U.S. Citizens residing overseas would leave a "gaping hole" in the regulatory scheme.  *See Raich*, 525 U.S. at 22; *Martinez*, 599 F. Supp. 2d at 808 ("[T]he Court has no difficulty concluding that Congress had a rational basis for believing that failure to regulate the non-commercial sexual abuse of minors 'would leave a gaping hole' in the PROTECT Act and its ability to regulate the commercial industry of child prostitution.").

### b.  18 U.S.C. § 2423(c) is Constitutional Based on the Treaty Power.

Congress's power to enact § 2423(c), as amended, is also grounded in its authority to pass legislation to implement treaties entered into by the United States.  It is well-established that Congress may enact laws to implement treaties to which the United States is a party.  *See* U.S. Const. Art. I, § 8, cl. 18; U.S. Const. Art. II, § 2, cl. 2; *Missouri v. Holland*, 252 U.S. 416, 432 (1920).  Laws made in pursuance of treaties entered into by the United States are the supreme law of the land, and are subject only to general constitutional constraints such as the protections provided by the Fifth Amendment to the Constitution.  *See Holland*, 252 U.S. at 433; *Reid v. Covert*, 354 U.S. 1, 17 (1957) (affirming that while treaties are a source of authority for legislation, the exercise of the treaty power must still observe constitutional prohibitions).  The treaty power is thus a specific, enumerated source of authority for Congressional legislation.

Section 2423(c) may be upheld as legislating the Optional Protocol to the Convention on the Rights of the Child on the Sale of Children, Child Prostitution, and Child Pornography

("Protocol").  The Protocol, opened for signature May 25, 2000, S. Treaty Doc. No. 106-37, UN

Doc. A/RES/54/263.  (Attachment 7).  The Protocol was ratified by the United States Senate on

June 18, 2002.  *See* 148 Cong. Rec. S5717-01.  Many countries that have been the destination of

U.S. citizens charged under the new extraterritorial sex tourism provisions are also party to the

Protocol.  *See* Status of Ratification of the Protocol, available at http://indicators.ohchr.org/ (last

accessed March 23, 2017).  The preamble to the Protocol recognized that the signatory nations

are "[d]eeply concerned at the widespread and continuing practice of sex tourism, to which

children are especially vulnerable, as it directly promotes the sale of children, child prostitution

and child pornography."  *See* Protocol, preamble.  The Protocol requires signatories to ensure "as

a minimum" that the acts and activities defined within are "fully covered under its criminal or

penal law, whether these offences are committed domestically or transnationally or on an

individual or organized basis" and further specifies that "[e]ach State Party shall make these

offences punishable by appropriate penalties that take into account their grave nature."  *Id.*,

art. 3.  These offenses include "[i]n the context of sale of children . . . offering, delivering or

accepting . . . a child for the purpose of [s]exual exploitation of the child," "obtaining . . . a child

for child prostitution," and "producing, distributing, disseminating, importing, exporting,

offering, selling or possessing . . . child pornography."  *Id.*  The Protocol defines child

prostitution as "the use of a child in sexual activities for remuneration or any other form of

consideration."  *Id.*, art. 2(b).  Child pornography is defined as "any representation, by whatever

means, of a child engaged in real or simulated explicit sexual activities or any representation of

the sexual parts of a child for primarily sexual purposes."  *Id.*, art. 2(c).

The Protocol also recognized the need for a "holistic approach" to eliminate the sale of

children, child prostitution, and child pornography.  *Id.*, preamble.  The requirement to cover

offenses "committed domestically or transnationally" is not narrowly confined to those who recently left their own nation for another, and as such, the Protocol calls on signatories to pass legislation covering all citizens and permanent residents—not just those who travel in foreign commerce.  Therefore, the Protocol provides an explicit framework for extraterritorial jurisdiction over United States citizens who engage in a variety of sexual exploitation acts of children while overseas.  While the Protocol's use of terms such as "sale of children" and "child prostitution" indicates that the prohibition of commercial sex acts with minors is a central concern of the Protocol, the treaty creates far-reaching obligations.  It is significant that the Protocol broadly defines child prostitution to include "the use of a child in sexual activities for remuneration *or any other form of consideration*" *Id.*, art. 2 (emphasis added).[5]  This broad definition of child prostitution makes it difficult to distinguish commercial from non-commercial sex acts because the "payment" involved in child prostitution may involve any variety of consideration, in amounts that may evade detection.  Such payments may go to a third party (such as a tour operator, hotel, or other person) and thus the child victim may be unaware of the commercial nature of the transaction.  Furthermore, payments for sexual acts could be disguised as payments for seemingly legitimate purposes (e.g., an offer to provide English lessons to the victim), making a quid pro quo for the sexual act even more difficult to prove.

President Clinton's introduction of the Protocol to the Department of State and the Senate also demonstrate the broad goals of this treaty.  In his letter of submittal to the Department of State of both the Protocol described above and the Optional Protocol to the Convention on the Rights of the Child on Involvement of Children in Armed Conflict, President Clinton stated, "It

---

[5] Similarly, the Protocol broadly defines the sale of children to mean "any *act* or transaction whereby a child is transferred by any person or group of persons to another for remuneration or *any other consideration*." *Id.* (emphasis added).

is essential that we work with all of our international partners to achieve our common objective: the elimination of abuses of the world's children." Letter of Submittal from President Clinton to the Department of State, S. Treaty Doc. No. 106-37, 2000 WL 33366017 (July 13, 2000). President Clinton followed in the letter of transmittal to the Senate, stating "[t]hese Protocols represent a true breakthrough for the children of the world" and emphasized that ratification would "enhance the ability of the United States to provide global leadership in the effort to eliminate abuses against children with respect to armed conflict and sexual exploitation." Letter of Transmittal from President Clinton to the United States Senate, S. Treaty Do. No. 106-37, 2000 WL 33366017 (July 25, 2000).

Congress's authority to legislate pursuant to the treaty power is similarly broad. Under the Necessary and Proper Clause, the question is whether the statute "constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." *Comstock*, 560 U.S. at 133. Section 2423(c), which reaches acts of both commercial and non-commercial sexual exploitation committed by U.S. citizens overseas, is a rational means of meeting the United States's treaty obligations under the Protocol. That more narrow legislation might also implement the treaty obligations does not undermine this argument. For example, in *United States v. Belfast*, 611 F.3d 783 (11th Cir. 2010), the Eleventh Circuit determined that the Torture Act, 18 U.S.C. §§ 2340-2340A, reasonably implemented the Convention Against Torture ("CAT"), even though the Torture Act defined "torture" more broadly than the CAT in several respects. Nonetheless, *Belfast* found that, "[p]ut simply, the CAT created a floor, not a ceiling, for its signatories in their efforts to combat torture." *Id.* at 806. Similarly, the Protocol required the signatories to cover under its criminal law the acts described "as a minimum." *Protocol*, art. 3. Moreover, the court in *Belfast* observed that Congress's "more expansive definition of

torture" (than the treaty's definition) is "that much more faithful to the CAT's purpose of enhancing global efforts to combat torture." *Belfast*, 611 F.3d at 809; *see also United States v. Yian*, 905 F.Supp. 160, 163 (S.D.N.Y. 1995) (recognizing that in reviewing legislation enacted under the treaty power, the question is not whether the treaty "required" the statute to be enacted because "the appropriate judicial standard for reviewing [implementing legislation] is not strict scrutiny, but, rather, rational basis review").[6]

Cases upholding the pre-2013 Amendment of § 2423(c) under the treaty power even as applied to non-commercial sex acts support this argument. *See United States v. Martinez*, 599 F. Supp. 2d 784, 798-99 (W.D. Tex. 2009) ("One of the statutes that Congress enacted to implement the Optional Protocol was § 2423."); *United States v. Pendleton*, CRIM.08-111-GMS, 2009 WL 330965 (D. Del. Feb. 11, 2009) *aff'd on other grounds*, 658 F.3d 299 (3d Cir. 2011) ("[T]he court further finds that § 2423(c) . . . [is] valid [because it is] 'necessary and proper' to the implementation of the United States' international treaty obligations."). *See also United States v. Frank*, 486 F.Supp.2d 1353, (S.D.Fla. 2007) *aff'd on other grounds*, 599 F.3d 1221 (11th Cir. 2010) (holding that sex tourism provisions of § 2423(c) are a constitutional exercise of Congress's authority to enact implementing legislation for treaties); *United States v. Flath*, 845 F. Supp. 2d 951, 957 (E.D. Wis. 2012) ("Congress also had separate and independent authority to enact § 2423(c) under the Necessary and Proper Clause of the Constitution to implement a

---

[6] The Defendant cites to both *Belfast* and *United States v. Lue*, 134 F.3d 79 (2d Cir. 1998), but neither case support what he is alleging—that a federal statute is unconstitutional if it does not fully track the language of the treaty. *See Belfast*, 611 F.3d at 804 ("Notably, the existence of slight variances between a treaty and its congressional implementing legislation do not make the enactment unconstitutional; identicality is not required."); *Lue*, 134 F.3d at 84 ("In effect, however, the "plainly adapted" standard requires that the effectuating legislation bears a rational relationship to a permissible constitutional end. Were this not the case, any congressional enactment not passed pursuant to an expressly enumerated power would be subject to challenge on some more rigorous means-end analysis. Such thoroughgoing judicial involvement in the day-to-day enactments of Congress would undercut the foundation on which *M'Culloch* rests: the need to preserve a realm of flexibility in which Congress can carry out its delegated responsibilities.").

treaty."); *United States v. Pepe*, No. 07-168-DF, slip op. at 6 (C.D. Cal. Dec. 3, 2007) (denying

defendant's Motion to Dismiss and concluding that § 2423(c) "reasonably implements" the

obligations of the United States under the Protocol and "is thus a necessary and proper means of

implementing the government's treaty-making powers"). As held by courts assessing the earlier

version of § 2423(c), the residency provision may be viewed as legislation implementing the

Protocol.[7]

The Senate's ratification of the Protocol included the declaration that the provisions of

the Protocol (other than Article 5) are non-self-executing, current United States law fulfills the

its obligations, and that "United States does not intend to enact new legislation to fulfill its

obligations under the Protocol." *See* 148 Cong. Rec. S5717-01, *S5719. This did not, however,

constrain future Congressional legislation implementing this multilateral agreement. Although

Congress did not reference the Optional Protocol when it enacted or expanded § 2423(c), the

treaty power still may be invoked as a source of Congressional authority for that legislation. *See,*

*e.g.*, *United States v. Georgescu*, 723 F. Supp. 912, 918 (E.D.N.Y. 1989) (finding that challenged

statute could be "constitutionally justified" as within Congressional authority to implement

certain conventions, even though Congress did not expressly indicate its treaty power as the

constitutional basis); *see also Hardeman*, 2011 WL 13143962, at *2 ("The PROTECT Act,

moreover, arises out of the United States Senate's ratification of the Optional Protocol to the

Convention on the Rights of the Child on the Sale of Children, Child Prostitution and Child

Pornography."). Under the rational basis standard, the question is whether this Court can

identify any legitimate government purpose which Congress could have been pursuing.

---

[7] This is particularly clear in light of the Justice for Victims of Trafficking Act of 2015, which added "production of child pornography" into the definition of "illicit sexual conduct" of § 2423(c). Criminalizing the acts of a producer or possessor of child pornography for the purposes as defined in the Protocol falls directly under the obligations of the Protocol's signatories. Protocol, Art. 3.

Congress's actual motivations are "entirely irrelevant" to the analysis.  *See F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993).  Courts should uphold § 2423(c) as necessary and proper to the treaty power even if the legislative history did not specifically invoke the Protocol as the specific constitutional basis for the enactment.  *See also College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 131 F.3d 353, 358 (3d Cir. 1997) (Congress's "failure to explain fully the constitutional justification for its enactment does not invalidate the [statute], for Congress is not required to discuss or explain explicitly the constitutional basis for laws that it enacts.") (citing *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993) (holding that a legislature is "never require[d] . . . to articulate its reasons for enacting a statute") (alterations in original); *EEOC v. Wyoming*, 460 U.S. 226, 243-44 n. 18 (1993)).

Therefore, § 2423(c) is independently supported by Congress's power to implement treaties to which the United States is a party.

### c.   18 U.S.C. § 2423(c) is Constitutional Based on Congress's Plenary Powers Over Citizens and Foreign Affairs.

An essential element of § 2423(c) is that the defendant is a United States citizen or alien admitted for permanent residence.  18 U.S.C. § 2423(c).  There is an important line of cases indicating that the power of the United States to criminalize the extraterritorial acts of its nationals is inherent in sovereignty, and stands apart from powers enumerated in the Constitution.

The Supreme Court has stated broadly that, while congressional legislation is generally construed to apply only within the territorial jurisdiction of the United States unless a contrary intent appears, "the question of its application, so far as citizens of the United States in foreign countries are concerned, is one of construction, not of legislative power."  *United States v.*

*Blackmer*, 284 U.S. 421, 437 (1932) (emphasis added).  In *Blackmer*, the Supreme Court upheld

the contempt conviction of the defendant, a United States citizen, for failing to comply with a

criminal subpoena that was served on him while he was a resident of France. As discussed

below, the Court in *Blackmer* also addressed whether the assertion of extraterritorial jurisdiction

over a United States citizen comported with due process.  *See id*. at 438.  The Court in *Blackmer*

did not limit its decision to the constraints imposed by the Due Process Clause, however, and

also discussed legislative power over United States citizens overseas as being a "power inherent

in sovereignty." 284 U.S. at 437.  *See also United States v. Lansky*, 496 F.2d 1063, 1067 (5th

Cir. 1974).  *Blackmer*, and numerous decisions following in its path, discuss citizenship as a

source of congressional legislative power and not just as a factor that makes the exercise of

power derived from another source constitutional.

In *United States v. Mitchell*, 553 F.2d 996 (5th Cir. 1977), the court addressed whether

Congress intended the Marine Mammal Protection Act to apply to actions by United States

citizens in the territorial waters of other Nations.  *Mitchell* held that while the Act did extend to

violations of the Act in the "high seas" or non-territorial waters, it did not extend to the taking of

protected mammals in the waters of other sovereign states.  *Id*. at 1004-05.  In reaching this

decision, the court in *Mitchell* explicitly recognized that Congress could have exercised authority

over the acts of United States citizens in foreign territorial waters if it had chosen, and that this

power would have been based on congressional authority to control the conduct of American

citizens overseas.  *Id*. at 1001 (citing *Blackmer* and stating that "[t]he Supreme Court has held

repeatedly that the legislative authority of the United States over its citizens extends to conduct

by Americans on the high seas and even within the territory of other sovereigns").

26

Similarly, the Second Circuit in *Gatlin* held that the territorial provisions of 18 U.S.C. §7(3) did not generally extend to the acts of United States citizens on "lands reserved or acquired for the use of the United States" in a foreign nation.  *United States v. Gatlin*, 216 F.3d 207, 210 (2d Cir. 2000).  In doing so, however, the *Gatlin* opinion assumed that such an extension would have been within congressional power, stating that congressional authority to regulate the conduct of its nationals outside the territorial boundaries of the United States is undisputed and that therefore "the issue in this case is one of congressional intent – that is, statutory construction– not of congressional power."  *Id*. at 211 (emphasis added).  *See also United States v. King*, 552 F.2d 833, 850-52 (9th Cir. 1976) (stating that there is "no constitutional bar to the extraterritorial application of penal laws" and suggesting that authority over United States citizens overseas is a source of Congressional legislative power).

In *United States v. Clark*, 435 F.3d 1100, 1106 (9th Cir. 2006), the Ninth Circuit found that the nationality principle of international law "permits a country to apply its statutes to extraterritorial acts of its own nationals" without infringing on the other nation's sovereignty. (quoting *United States v. Hill*, 279 F.3d 731, 740 (9th Cir. 2002)).  While the Ninth Circuit's holding in *Clark* that the prior version of § 2423(c) was constitutional was based primarily on the foreign commerce power, the court recognized that Congress's plenary authority over foreign affairs may also provide a sufficient basis for § 2423(c).  *Clark*, 435 F.3d at 1109 n. 14.

In *United States v. Frank*, 599 F.3d 1221, 1233 (11th Cir. 2010), *cert. denied* 562 U.S. 876 (2010), the Eleventh Circuit found that 18 U.S.C. § 2251A (Selling or buying of children) applied extraterritorially to reach the defendant's conduct outside of the United States because under the "nationality" principle, a country may "exercise criminal jurisdiction over one of its nationals." (citing *United States v. Plummer*, 221 F.3d 1298, 1307 (11th Cir. 2000)).  "Because

[defendant] is a United States citizen, the United States properly exercised jurisdiction over him."  *Id.* (citing *United States v. Mitchell*, 553 F.2d 996, 1001 (5th Cir. 1977) ("[A] state may punish the wrongful conduct of its citizens no matter where it takes place.").

In addition to being based on the broad power to punish the acts of United States citizens overseas, the extraterritorial reach of federal criminal laws is grounded in the inherent power to legislate in external affairs and matters touching on foreign relations.  The Supreme Court plainly drew this distinction in *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 315 (1936) in which it recognized the "differences between the powers of the federal government in respect to foreign or external affairs and those in respect of domestic or internal affairs."  As the Court explained, the "broad statement that the federal government can exercise no powers except those specifically enumerated in the Constitution . . . is categorically true only in respect to our internal affairs."  299 U.S. at 315-16.

The Supreme Court's sweeping recognition of federal power in external affairs was recognized by a panel of the Ninth Circuit Court of Appeals in *United States v. Hernandez-Guerrero*, 147 F.3d 1075 (9th Cir. 1998) *cert. denied*, 119 S. Ct. 433 (1998).  In *Hernandez-Guerrero*, the court upheld Congress's authority to pass criminal immigration legislation, relying on the fact that, although the immigration power is not enumerated in the Constitution, it has been "universally acknowledged that Congress possesses authority over immigration policy as 'an incident of sovereignty.'" *Id*. at 1076 (quoting *Chae Chan Ping v. United States*, 130 U.S. 581, 609 (1889)).  The court in *Hernandez-Guerrero* further explained that Congress's power to enact criminal immigration laws derives from a concern for "our relation with foreign nations" and that, therefore, Congress is not bound by the "rigid constraints" that limit its power in domestic contexts.  *Id*. at 1077.  Because Congressional authority to enact the immigration

28

legislation at issue in *Hernandez-Guerrero* was firmly based in Congress's inherent power over immigration, the court explicitly declined to rely on Congress's enumerated power under the Foreign Commerce Clause.  *Id*. at 1078.

Congress's exercise of broad, non-enumerated powers over United States citizens appears most clearly in the foreign murder statute found at Title 18, United States Code, § 1119.  Section 1119(b) provides that "[a] person who, being a national of the United States, kills ... a national of the United States while such national is outside the United States but within the jurisdiction of another country shall be punished as provided under sections 1111, 1112, and 1113."  Section 1119(b) makes no mention of Congress's power to regulate foreign commerce or any other enumerated power.  While the statute requires that the victim is a United States citizen, this requirement is simply an additional basis for criminal jurisdiction by a nation and not a prerequisite for its constitutionality.  *See, e.g., Rivard v. United States*, 375 F.2d 882, 885, n. 9 (5th Cir. 1967) (describing the five general principles under international law for the exercise of criminal jurisdiction by a nation: territorial (place of the offense), national (nationality or national character of the offender), protective (whether national interest is injured), universality (custody of the offender), and passive personality (nationality or national character of the victim)).

The only two published cases addressing a challenge to § 1119 on the grounds that it is beyond the subject matter jurisdiction of Congress appear to be *United States v. White*, 51 F.Supp.2d 1008 (E.D. Cal. 1997) and *United States v. Brimager*, 123 F. Supp. 3d 1246 (S.D. Cal. 2015).  The defendant in *White* was a United States citizen and civilian who was arrested by Japanese authorities for the death of her two-year-old son, who was also an American citizen. *Id*. at 1010.  The Japanese authorities declined to prosecute the defendant and she was returned to

the United States, where she was soon indicted under § 1119.  *Id.*  The Court in *White* quickly rejected the defendant's claim that Congress is restricted to enumerated powers in enacting statutes with extraterritorial reach, relying on the "fundamental" differences between federal power with respect to internal and external affairs.  51 F.Supp.2d at 1010-1011 (citing *Curtiss-Wright*, 299 U.S. at 315-16).  As recognized by the Court in *White* in upholding § 1119, "[i]t is pellucid Congress possesses external sovereignty authority to pass criminal laws proscribing its nationals' outlaw conduct against other nationals abroad."  *Id.* at 1011.

The defendant in *Brimager* was a United States citizen who flew to Panama with the victim, also a United States citizen.  123 F. Supp. 3d at 1247.  Two months later, he killed her, dismembered and disposed of her body, and undertook to cover up her disappearance.  *Id.*  The court held that the foreign murder statute was constitutional under Congress's plenary power over external affairs.  *Id.* at 1253.  Citing *United States v. King*, 552 F.2d 833 (9th Cir. 1976), the court also found that at least two of the five recognized principles of international jurisdiction provided independent Congressional authority for the statute's enactment, specifically the territorial principle, which allows nations to punish acts that produce detrimental effects within their borders, and the nationality principle, which is based on the nationality of the accused.  *Brimager*, 123 F. Supp. 3d at 1250, 1253.[8]

The foreign murder statute is not alone in its reach of United States laws to United States citizens abroad.  The criminal code is replete with examples of unambiguous congressional intent to apply U.S. law to both citizens and non-citizens overseas.  *See, e.g.,* 18 U.S.C. § 112(e)

---

[8] As a matter of first impression, the *Brimager* court also held that the foreign murder statute was constitutional under the Foreign Commerce Clause, citing *United States v. Cummings*, 281 F.3d 1046 (9th Cir. 2002) (concerning Congressional authority for the International Parental Kidnapping Act) and *Clark*, 435 F.3d 100 (concerning § 2423(c)).  *Brimager*, 123 F. Supp. 3d at 1254-1255 ("Defendant has not plainly shown that Congress's foreign commerce power cannot be a basis for § 1119" despite the fact that "murder itself has no inherent commercial element.").

(protection of foreign officials, official guests, and internationally protected persons) ("If the victim of an offense under subsection (a) is an internationally protected person outside the United States, the United States may exercise jurisdiction over the offense if . . . an offender is a national of the United States . . ."); 18 U.S.C. § 1621 (perjury) ("This section is applicable whether the statement or subscription is made within or without the United States."); 18 U.S.C. § 2381 (treason) ("Whoever, *owing allegiance to the United States*, levies war against them or adheres to their enemies, giving them aid and comfort *within the United States or elsewhere*, is guilty of treason . . .") (emphasis added).

The power to legislate with respect to external affairs, particularly where a United States citizen is involved, must still be exercised within constraints of other Constitutional provisions such as the Due Process Clause. This does not lessen recognition in a long line of cases that the power to extend federal criminal laws to acts of United States citizens overseas is inherent in sovereignty. While it is not necessary to rely on this inherent power, broad judicial recognition of the sweeping nature of this power should direct the Court's assessment of the statutes at issue in this case and should lead to the conclusion that § 2423(c) is within Congress's constitutional power.

> **d.  Section 2423(c) Does Not Violate the Due Process Clause of the Fifth Amendment.**

While penal statutes may be applied extra-territorially, that application cannot violate the Due Process Clause of the Fifth Amendment of the United States Constitution. *See United States v. Brehm*, 691 F.3d 547, 552 (4th Cir. 2012) ("Though a criminal statute having extraterritorial reach is declared or conceded substantively valid under the Constitution, its enforcement in a particular instance must comport with due process."). The Fifth Amendment's Due Process Clause provides that no person shall "be deprived of life, liberty, or property without due process

of law . . . ."  According to the Fourth Circuit, due process involves "'a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair.'"  *Id.* at 552 (citing *United States v. Davis*, 905 F.2d 245, 248-49 (9th Cir. 1990)).  *But see Ballestas*, 795 F.3d at 148 (D.C. Circuit has yet to decide "whether the Constitution limits the extraterritorial exercise of federal criminal jurisdiction.") (quoting *United States v. Ali*, 718 F.3d 929, 934-44 (D.C. Cir. 2013); *see also* Curtis A. Bradley, *Universal Jurisdiction and U.S. Law,* 2001 U. CHI. LEGAL F. 323, 338 (2001) ("[I]t may be logically awkward for a defendant to rely on what could be characterized as an extraterritorial application of the U.S. Constitution in an effort to block the extraterritorial application of U.S. law.") (cited by *Ali*, 718 F. 3d at 944).

As set forth above, under principles of international law, a nation may apply its statutes to extraterritorial acts of its own citizens.  *Blackmer*, 284 U.S. at 436 ("By virtue of the obligations of citizenship, the United States retained its authority over him, and he was bound by its laws made applicable to him in a foreign country."); *Mitchell*, 553 F.2d at 1001 ("[t]he Supreme Court has held repeatedly that the legislative authority of the United States over its citizens extends to conduct by Americans on the high seas and even within the territory of other sovereigns").  *See also United States v. Hill*, 279 F.3d 731, 740 (9th Cir. 2002) (citing *United States v. Thomas*, 893 F.2d 1066, 1069 (9th Cir. 1990) ("Extraterritorial jurisdiction is also proper under the nationality theory, which permits a country to apply its statutes to extraterritorial acts of its own nationals.")).  Thus, "where the government seeks to prosecute a United States citizen for acts occurring in foreign lands, due process does not require a demonstration of 'nexus.'"  *United States v. White*, 51 F. Supp. 2d 1008, 1011 (E.D. Cal. 1997) ("Moreover, even if a nexus was required, it has been established.  Defendant is an American citizen and she is accused of killing

another American citizen.  The interest of the United States in this case can hardly be
questioned.").

    In arguing that punishing his conduct violates his due process rights,  Defendant did not
cite a single case where the court found a due process violation. D. 18 at 20-21.  By virtue of his
citizenship, Park may be prosecuted for his criminal activity in Vietnam.  Because § 2423(c)
only applies to United States citizens and aliens admitted for permanent residence, application of
the law to his conduct is neither arbitrary nor fundamentally unfair since a sufficient nexus exists
between Park and the United States. *See United States v. Walczak*, 783 F.2d 852, 854-55 (9th
Cir. 1986) (treating nationality principle as sufficient basis for exercise of subject matter
jurisdiction).  However, even if the nexus were not established solely on the basis of Park's
citizenship, his continuous ties with the United States would satisfy this requirement.  As set
forth above, Park was at all times a United States citizen.  He had one United States passport,
which had been renewed on January 27, 2010 with an expiration of January 26, 2020, and
another under the De Masi name, which had been renewed on July 24, 2007 with an expiration
of July 23, 2017.  He also maintained a New York State Driver License under Demasi, which
was issued on September 10, 2008 with an expiration of May 12, 2017, which listed a New York
City address.  His International Driving Permit, also under Demasi, was issued on June 1, 2012
within the United States, and listed his permanent place of residence as New York.  In other
official documents, he listed his permanent address as other United States locations, such as Las
Vegas, Nevada and Miami, Florida.  He also maintained United States currency.  At no point did
Park purchase a home or other property abroad, nor did he make any effort to obtain permanent
status in another country.  Park was constantly traveling since at least 2003, the last known trip

from the United States, even applying for additional visa pages for his U.S. Passport in September 2012, stating that he planned to travel for an indefinite period of time.

In *Brehm*, the Fourth Circuit held that due process was not violated for a defendant who was a citizen of South Africa who assaulted a British subject on a NATO-operated military base in Afghanistan because his actions affected significant American interests.  691 F.3d at 552. Further, because Afghanistan had disclaimed any interest in prosecuting criminal conduct at the airfield, the court found that "due process is not offended by the United States stepping into the jurisdictional void."  The Court also cites to *United States v. Al Kassar*, 660 F.3d 108, 119 (2d Cir. 2011) in stating, "[f]air warning does not require the defendants understand that they could be subject to criminal prosecution *in the United States* so long as they would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere." Here, there is a sufficient nexus between Park and the United States even beyond "American interests" and a desire to fill a "jurisdictional void," such that application of § 2423(c) would not be arbitrary or fundamentally unfair.  Also, just as the weapons charge in *Al Kassar*, Park was "not ensnared by a trap laid for the unwary" since sexual exploitation crimes involving children victims is "self-evidently criminal."  *See Al Kassar*, 660 F.3d at 119.  In fact, Park has been committing child sexual exploitation crimes since the 1980s and has been either fleeing from or been forced to leave other countries as a result of that criminal behavior since that time.  Park had plenty of notice and knowledge that he could be criminally responsible for his sexual offenses.

**e.  Application of Section 2423(c) to Defendant is not an Ex Post Facto Application of the Law.**

There is nothing about the defendant's conduct in 2013 through 2015 that makes his actions "innocent when done."  Contrary to Defendant's argument, the statute does not

criminalize his move from the United States to a foreign country in 2003, but rather criminalizes his engaging in illicit sexual conduct in a foreign country after he is there.  In 2013, at the time of the amendment of 2423(c), Park was (1) a United States Citizen or permanent resident; (2) who resided, either temporarily or permanently, in a foreign country; and (3) engaged in illicit sexual conduct.  18 U.S.C. § 2423(c).  The defendant does not and cannot cite to anything to support his conclusory statement that because he had "begun to reside in a foreign country" more than a decade prior to the amendment of the statute, application of § 2423(c) to the defendant violates *Ex Post Facto.  See United States v. Schmidt*, 845 F.3d 153, 158 n. 3 (4th Cir. 2017) ("Contrary to protestations of permanency, Schmidt was something of a rolling stone.  Schmidt's conviction does not present an ex post facto problem because he was still traveling in foreign commerce and engaging in illicit sexual conduct after § 2423(c) was enacted on April 30, 2003.").  Like, *Schmidt*, Park travelled in foreign commerce or resided, either temporarily or permanently in a foreign country, and engaged in illicit sexual conduct after § 2423(c) was amended on March 7, 2013.  *See also Phillips v. United States*, 734 F.3d 573, 575 (6th Cir. 2013) ("[T]he district court addressed the merits and ruled that Phillips's foreign travel need not have preceded the date of enactment of § 2423(c), as long as the illicit sexual conduct occurred after the statute was enacted, which in Phillips's case it did.").

## V.     Conclusion

Accordingly, for all of the reasons stated above, the United States respectfully requests that the Defendant's Motion to Dismiss the Indictment be denied.

Respectfully submitted,

Steven J. Grocki
Chief
U.S. Department of Justice
Child Exploitation and Obscenity Section


_____/s/_____
Alexandra R. Gelber, Deputy Chief
D.C. Bar 473773
U.S. Department of Justice
Child Exploitation and Obscenity Section
1400 New York Ave. N.W., Suite 600
Washington, DC 20530
Telephone: (202) 307-1316
alexandra.gelber@usdoj.gov


_____/s/_____
Lauren S. Kupersmith, Trial Attorney
U.S. Department of Justice
Child Exploitation and Obscenity Section
1400 New York Ave. N.W., Suite 600
Washington, DC 20530
Telephone: (202) 514-1564
lauren.kupersmith@usdoj.gov