**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | CRIM. NO. 16-0009 (TSC) |
| v. : | |
| : | |
| JOSEPH RICKY PARK, : | |
| : | |
| Defendant. : | |

_____

**REPLY IN SUPPORT OF THE MOTION TO DISMISS THE INDICTMENT**

The government does not dispute that prior to his forcible return to the United States in 2016, Mr. Park had not traveled to or from the United States, nor resided within the United States since at least 2003. Nor does the government dispute that he was domiciled in Vietnam from at least 2012 until his arrest in this case. The government has shown no evidence that Mr. Park exhibited any intention to return to the United States. The mere fact that he maintained United States documents such as a driver's license and passport, and had a post office box in the United States does not demonstrate that he had any intention of ever returning to the United States. Nor does it matter if he did. During all times relevant to this case and the 14 years preceding it, he never entered the United States. And, the government relies solely and entirely on noncommercial sex acts that allegedly occurred in 2015 in its indictment of Mr. Park. The application of 18 U.S.C. § 2423(c) to him is unreasonable and unconstitutional. Congress has no authority to prosecute and punish illicit sexual conduct in a foreign country based only on United States citizenship because the Constitution simply does not confer on Congress an absolute power to police U.S. citizens with respect to their alleged criminal acts anytime, anywhere in the world – not through the Foreign Commerce Clause nor through any other provision.

Contrary to the government's assertions, (1) Congress's power to regulate foreign commerce is limited; (2) section 2423(c) is wholly unrelated to the implementation of Congress's power to regulate foreign commerce; and (3) section 2423 (c) is not supported by any authority independent of the Foreign Commerce Clause.

The government would have the Court believe that Congress's power to regulate interstate or foreign commerce is essentially unlimited. Some courts are rightfully "skeptical" of this argument. *United States v. Al-Maliki*, 787 F.3d 784, 795 (6th Cir. 2015). As the Sixth Circuit explained,

> an unbounded reading of the Foreign Commerce Clause allows the federal government to intrude on the sovereignty of other nations—just as a broad reading of the Interstate Commerce Clause allows it to intrude on the sovereignty of states. More importantly, an overbroad interpretation of the Foreign Commerce Clause allows the government to intrude on the liberty of individual citizens. And that seems at least as wrong as a reading of the Commerce Clause that allows the government to intrude on the States.

*Id*. (citing U.S. CONST. amend. X). The government's reliance on Supreme Court precedent—and on any courts that have, purportedly based on the same precedent, construed the Foreign Commerce Clause more broadly than the Interstate Commerce Clause is misplaced. The cases cited by the government concern the dormant Commerce Clause and emphasize federal power over state power to regulate foreign commerce; they say nothing of the scope of federal Foreign Commerce Clause power generally. *See Baston v. United States*, 137 S. Ct. 850, 851 (2017), *denying cert. to* 818 F.3d 651 (11th Cir. 2106) (Thomas, J., dissenting) (explaining that *Japan Line* "articulated limits on the power of the States to regulate commerce with foreign nations under the so-called dormant Foreign Commerce Clause"); *see also Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 310 (1994) (the commerce clause "provides protection

from state legislation inimical to the national commerce even where Congress has not acted" (quotation marks and citation omitted)).  For example, in *Board of Trustees of University of Illinois*, the Court explained that "[t]he principle of duality in our system of government does not touch the authority of the Congress in the regulation of foreign commerce," such that "[i]f the Congress saw fit to lay an embargo or to prohibit altogether the importation of specified articles, as the Congress may . . . , no state by virtue of any interest of its own would be entitled to override the restriction."  289 U.S. at 57.  Similarly, in *Japan Line*, the Court explained that "the Framers intended the scope of the foreign commerce power to be greater than the power to regulate domestic commerce" such that the federal government has more power *than the states do* to regulate foreign commerce.  441 U.S. at 448; *cf. Barclays Bank PLC*, 512 U.S. at 311 ("In the unique context of foreign commerce, a State's power is further constrained because of the special need for federal uniformity." (quotation marks and citation omitted)).

Thus, all that is established with respect to federal Foreign Commerce Clause power is that "[t]he power to regulate commerce with foreign countries" is "exclusive," *Al-Maliki*, 787 F.3d at 794, and, "[a]s an exclusive power, its exercise may not be limited, qualified, or impeded to any extent *by state action*."  *Bd. of Trs. of Univ. of Ill.*, 289 U.S. at 56-57 (emphasis added).  However, Congress must still "act[] 'within its compass.'"  *Al-Maliki*, 787 F.3d at 793 (quoting *Henderson v. Mayor of City of N.Y.*, 92 U.S. 259, 272-73 (1875)).  In other words, though "the States can't regulate foreign commerce in place of the federal government[,] . . . . Congress must still regulate *commerce*, and it does not have exclusive or plenary power unless it does so."  *Id*. at 794 (emphasis added); *see also United States v. Bianchi*, 386 F. App'x 156, 163 (3d Cir. 2010) (Roth, J., dissenting) ("Although . . . Congress's foreign commerce power is broad, . . . it has never been deemed unlimited.  Congress may regulate activities that are *commercial* in nature or

3

substantially affect foreign *commerce*." (emphasis in original)); *United States v. Clark*, 435 F.3d 1100, 1118 (9th Cir. 2006) (Ferguson, J., dissenting) ("[R]estrictions on the scope of Congress's Foreign Commerce power . . . emanate from the constitutional text itself, which the [*Lopez*] tri-category framework also helps elucidate."). Accordingly, contrary to the government's assertion, Congress's foreign commerce power is *at least* as limited as its interstate commerce power. Upholding § 2423(c) as a constitutional exercise of congressional authority, even though it requires proof of only U.S. citizenship and a foreign act, would render congressional authority under the Foreign Commerce Clause unlimited and the Foreign Commerce Clause meaningless.

As Justice Thomas recently noted,

> [w]ithout guidance from [the Supreme] Court as to the proper scope of Congress' power under [the Foreign Commerce Clause], the courts of appeals have construed it expansively, to permit Congress to regulate economic activity abroad if it has a substantial effect on this Nation's foreign commerce. . . . The facts [in a case involving sex trafficking] are not sympathetic, but the principle involved is fundamental. We should grant certiorari and reaffirm that our Federal Government is one of limited and enumerated powers, not the world's lawgiver.

*Baston v. United States*, 137 S. Ct. 850 (2017) (dissenting from the denial of certiorari). *Baston*, unlike this case, involved commercial activities, and thus would have been more likely to meet this standard. *Id*. Justice Thomas notes that the courts of appeals have incorrectly applied the interstate commerce power cases to foreign commerce cases: "The courts of appeals have relied upon statements by this Court comparing the foreign commerce power to the interstate commerce power, but have removed those statements from their context." Many of these same decisions he points to are the opinions cited in the government's brief. (See Gov't. Op. at 14-18). "This Court's statements about the comparative breadth of the Foreign Commerce Clause are of questionable relevance where the issue is Congress' power to regulate, or even

4

criminalize, conduct within another nation's sovereign territory." *Id.* That is exactly what this case involves.

      As Justice Thomas noted:

> Taken to the limits of its logic, the consequences of the Court of Appeals' reasoning [in Baston] are startling. The Foreign Commerce Clause would permit Congress to regulate any economic activity anywhere in the world, so long as Congress had a rational basis to conclude that the activity has a substantial effect on commerce between this Nation and any other. Congress would be able not only to criminalize prostitution in Australia, but also to regulate working conditions in factories in China, pollution from powerplants in India, or agricultural methods on farms in France. I am confident that whatever the correct interpretation of the foreign commerce power may be, it does not confer upon Congress a virtually plenary power over global economic activity.

*Id.* At least in *Baston*, the activity being criminalized was economic in nature. Here, there is even less of a commerce clause rationale as there was no commercial activity and no travel from the United States after the enactment of the statute. The actions of Mr. Park, *as charged in the indictment*, are so insular as to have had no effect on commerce. The attempted inappropriate touching of a minor and the photographing of one unidentified unclothed minor, can have no "substantial effect on commerce between this Nation and any other" *id.* and there can be no rational basis for concluding that it does. While the goals of the PROTECT Act are laudable, "the principle involved is fundamental." *Id.* Congress has only those powers enumerated in the Constitution and as applied to Mr. Park, this is not one of those powers.

      Congress is simply not regulating any *commerce* with § 2423(c). *cf. Al-Maliki*, 787 F.3d at 794 ("Giving the word [commerce] 'the same meaning throughout' the Clause so it 'remains a unit,' . . . we doubt that Congress has regulated commerce here, much less commerce with a foreign country." (quoting *Gibbons v. Ogden*, 22 U.S. 1, 194, 9 Wheat. 1 (1824))). And the 2013 amendment makes the Congressional overreach particularly obvious. The government need not prove *any* "jurisdictional hook," however minimal. *See Scarborough v. United States*, 431 U.S.

5

563, 575 (1977) (describing "the minimal nexus that the firearm has been, at some time, in interstate commerce"). Therefore, to the extent that the government relies on cases finding the 2007 version of the statute constitutional and within the foreign commerce powers of Congress, based on its tenuous connection to a U.S. citizen's use of channels of foreign commerce at some point in time, these cases do not apply to prosecutions under the amended language in the statute requiring no use of any channel of foreign commerce at all, at any point in time.

The government argues that Congress can regulate activity conducted entirely overseas if such activity is part of a class of activities that has a substantial effect on foreign commerce. Even if true, there is no rational basis to conclude that a U.S. citizen residing abroad and engaging in illicit sexual conduct is part of a "class of activities" that have a substantial effect on foreign commerce. Govt. Op. at 14-17. However, nowhere does the government proffer any explanation as to how illicit sexual conduct—either domestically or abroad, commercial or noncommercial—has any effect whatsoever on foreign commerce, and neither did Congress in enacting § 2423(c). *Cf. Gonzales v. Raich*, 545 U.S. 1, 12 n.20, 21 n.32 (2005) (detailing Congress's findings on the impact of local manufacture, distribution and possession of controlled substances on the *national* drug market); *see also United States v. Comstock*, 560 U.S. 126, 153 (2010) (Kennedy, J., concurring) ("The rational basis referred to in the Commerce Clause context is a demonstrated link in fact, based on empirical demonstration.").

Notably, the government conflates the applicable standards. Congress may regulate foreign *economic* activities that substantially affect foreign commerce, but not foreign "*noneconomic* activity based solely on the effect that it may have on [foreign] commerce through a remote chain of inferences." *Raich*, 545 U.S. at 34-37 (Scalia, J., concurring) (emphasis added). Congress may regulate foreign *noneconomic* activity only "if that regulation is a

6

necessary part of a more general regulation of interstate commerce," or of some other legitimate regulation under the commerce power. *Id*. at 37. Here, the government proffers nothing to explain how commercial sex acts committed abroad affect commerce with foreign nations, nor does the government explain how the criminalization of noncommercial sex acts committed abroad is a necessary part of any regulation of interstate commerce or any other legitimate regulatory scheme enacted under the Foreign Commerce Clause.

Section 2423(c) has nothing to do with any interstate or domestic market for child sex acts. And Congress has no authority to regulate world markets. All of Congress's authority must come from the Constitution. *See Torres v. Lynch*, 136 S. Ct. 1619, 1624 (2016) ("In our federal system, 'Congress cannot punish felonies generally;' it may enact only those criminal laws that are connected to one of its constitutionally enumerated powers, such as a the authority to regulate interstate commerce." (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 428 (1821))). And foreign "acquiescence to [U.S.] federal regulation cannot expand the bounds of the Commerce Clause." *Raich*, 545 U.S. 29 (citing *United States v. Morrison*, 529 U.S. 598, 661-62 (2000) (Breyer, J., dissenting), and *United States v. Darby*, 312 U.S. 100, 114 (1941)); *cf. McCulloch v. Maryland*, 4 Wheat. 316, 424 (1819) ("To impose on [Congress] the necessity of resorting to means which it cannot control, which another government may furnish or withhold, would render its course precarious, the result of its measures uncertain, and create a dependence on other governments, which might disappoint its most important designs, and is incompatible with the language of the constitution.").

Thus, while Congress may very well have an interest in helping to eradicate child sexual abuse worldwide (and entirely outside of U.S. borders), Congress cannot further this interest by regulating a world market in the same way it may regulate a domestic market. The Constitution

7

simply does not give Congress the authority to regulate the global sex market, no matter how strong its interest in doing so.[1]

In any event, the government's reliance on *Raich* is misplaced because "Congress's power to effectuate a[n existing] comprehensive regulatory scheme was central to that opinion, . . . while no comparably general regulation of foreign commerce exists in this case." *Clark*, 435 F.3d at 1117 n.1 (Ferguson, J., dissenting). Moreover, in *Raich*, the respondents did not challenge the validity of the statutory scheme or the constitutionality of any particular provision or section of the Controlled Substances Act. 545 U.S. at 15, 23. Instead, and by contrast to the parties in *United States v. Lopez*, 514 U.S. 549 (1995), and *Morrison*, the respondents challenged only "individual applications of a concededly valid statutory scheme." *Id*. "This distinction [was] pivotal . . . ." *Id*.

By contrast, as in *Lopez*, section 2423(c) "is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the [entirely foreign] activity were regulated. It cannot, therefore, be sustained under [Supreme Court] cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects [foreign] commerce." *Raich*, 454 U.S. at 24 (quoting *Lopez*, 514 U.S. at 561). Additionally, as in *Morrison*, § 2423(c) simply does not regulate economic activity, and "the noneconomic, criminal nature of the conduct at

---

[1] The suggestion in *United States v. Martinez*, 599 F. Supp. 2d 784 (W.D. Tex. 2009), that there is a rational basis for concluding that not criminalizing noncommercial sex with minors could affect the price for child prostitution is entirely speculative and unsupported. Even if Congress's authority to regulate foreign activity that substantially affects foreign commerce is broad, "it does not permit the Court to 'pile inference upon inference,' . . . in order to establish that noneconomic activity has a substantial effect on [foreign] commerce." *Raich*, 545 U.S. at 36 (Scalia, J., concurring) (quoting *Lopez*, 514 U.S. at 567).

issue" is significant. *Id*. at 25 (quoting *Morrison*, 529 U.S. at 610).

Section 2423(b) criminalizes travel for the purpose of engaging in illicit sexual conduct abroad, which is exactly what Congress intended to, and has the authority to, criminalize. Any regulation must be limited to this conduct, not the conduct at issue here, where a U.S. citizen lawfully residing abroad allegedly commits a local, foreign crime. That the government may have more difficulty meeting a requisite burden of proof than it otherwise would in prosecuting a strict liability crime does not justify the Congressional overreach. Surely, the prosecution of this case, and other similar cases against U.S. citizens lawfully residing abroad, especially for alleged noncommercial conduct, has no conceivable impact on child sex trafficking—even in the aggregate.

Contrary to the Government's assertion (Gov't. Op. 19-25), Congress's power to enact §2423(c) as amended cannot rest of the authority to pass legislation to implement the Optional Protocol to the Convention on the Rights of the Child on the Sale of Children, Child Prostitution, and Child Pornography ("Protocol"). The Protocol quite clearly is aimed at the sale or commercial exploitation of children. Such was not the case here. The government's hypothetical scenario's aside (Gov't Op. at 21), there is no allegation whatsoever that Mr. Park engaged in the commercial exploitation of children in the conduct charged in this case. The fact that the President may have hoped that the Protocol would serve the "common objective [of] eliminating abuses of the world's children" (Govt. Op. at 22) does not mean that this statute can be supported by that Protocol. In fact, if the government's theory is correct, Congress could now pass a law outlawing spanking of children in a foreign country if Congress viewed it as an abuse of a child. Congress's authority to regulate conduct in a foreign country having no commercial aspect is not this broad. This is more than a "slight variance" between the treaty and

9

implementing legislation.  As the government concedes, "Congress did not reference the Optional Protocol when it enacted or expanded § 2423 (c)."  Govt. Op. at 24.  The statute neither identifies nor tracks a treaty.  At least as it relates to noncommercial acts, it was not enacted to implement the treaty and thus cannot be supported by Congress's power to implement treaties.

First, Congress passed § 2423(c) expressly pursuant to the Foreign Commerce Clause and not to enforce any treaty obligations.  *See* H.R. Rep. No. 107-525, at 2-5 (2002) (referring to travel in foreign commerce under Article 1, § 8 of the Constitution as authority for the legislation and making no mention of the Optional Protocol or treaty power); H.R. Conf. Rep. No. 106-66, 51-52, 2003 U.S.C.C.A.N. 683, 686 (making no mention of the Optional Protocol or treaty power and, rather, only the government's "problem[]" meeting the arguably proper standard of proof).  Notably, federal law prohibited child prostitution and travel in foreign commerce with the intent to engage in a sexual act with a child as early as September 1994, long before the Senate ratified the Optional Protocol in 2002.  *See* Violent Crime Control & Enforcement Act of 1994, Pub. L. No. 103-322, Title XVI, § 160001(g), 108 Stat. 2037 (1994) (codified at 18 U.S.C. § 2423(a)-(b)).

Consequently, the letter of transmittal to the Senate of the Optional Protocol recognizes that substantive child prostitution "acts violate criminal statutes under existing U.S. federal and state laws" and refers expressly to § 2423(b), which prohibits "travel with intent to engage in any sexual act with one under age 18."  S. Treaty Doc. No. 103-37, 2000 WL 33366017, at *15, 18.  And the government concedes that "[t]he Senate's ratification of the Protocol included the declaration that . . . current United States law fulfills its obligations [under the Protocol], and that [the] 'United States does not intend to enact new legislation to fulfill its obligations under the Protocol.'"  Gov't. Op. at 24 (quoting 148 Cong. Rec. S5717-01, *S5719).  The government

nonetheless argues that "the treaty power still may be invoked as a source of Congressional authority for [§ 2423(c)]" and urges the Court to "identify any legitimate government purpose which Congress could have been pursuing." Gov't Op. at 24. Section 2423(c) was enacted because, for some unexplained reason, prosecutors found it difficult to prove that offenders traveled with the intent to engage in illicit sexual conduct abroad. *See* H.R. Rep. 107-525 (2002) (explaining that eliminating the intent requirement would help "close significant loopholes in the law that persons who travel to foreign countries *seeking* sex with children are currently using to their advantage in order to avoid prosecution" (emphasis added)). Eliminating the government's burden to prove a necessary element of the crime is not a legitimate reason to amend a statute to limitless proportions. And if, in adding subsection (c) to § 2423 in 2003 Congress had intended to rely on the treaty power, it surely would have so stated.

Moreover, the letter of transmittal cautions that "U.S. extraterritorial jurisdiction based on nationality of the offender does not reach all offenses set forth in the Protocol." S. Treaty Doc. No. 103-37, 2000 WL 33366017, at *23. "Nonetheless," the letter explains, "since Article 4(2) is permissive rather than obligatory, U.S. law is consistent with the requirements of the provision" of the Optional Protocol that "provides that each State Party may, but is not obligated to, establish jurisdiction when [] the alleged offender is a national of that State . . . ." *Id*. at *21, 23 (emphasis added) (citing Optional Protocol, Art. 4((2)(a))). The Optional Protocol did not, by its plain terms, compel the enactment § 2423(c), and in ratifying the Protocol, Congress explicitly recognized the limit of its authority—it could not, and cannot, assert jurisdiction over an offender based only on the offender's U.S. citizenship. *See also id*. at *15 ("These acts violate criminal statutes under existing U.S. federal and state laws. The Protocol does not require that the above-listed elements be crimes *per se* or that specific crimes be established

11

under national law. Rather, the Protocol requires States Parties to ensure that acts and activities specified in Article 3(1) are covered by its criminal law.").

Second, while the Necessary and Proper Clause "empower[s] Congress to pass laws 'necessary and proper for carrying into Execution the power to make Treaties," the Constitution does "not authorize Congress to enact laws for carrying into execution 'Treaties,' even treaties that do not execute themselves." *Bond v. United States*, 134 S. Ct. 2077, 2098 (2014) (Scalia, J., concurring). As Justice Scalia explained,

> a power to help the President make treaties is not a power to implement treaties already made. . . . Once a treaty has been made, Congress's power to do what is "necessary and proper" to assist the making of treaties drops out of the picture. To legislate comp[liance with the United States' treaty obligations, Congress must rely upon its independent (though quite robust) Article I, § 8, powers.

*Id*. at 2099 (citation omitted).

Thus, contrary to the government's assertion that "[i]t is well-established that Congress may enact laws to implement treaties to which the United States is a party," Gov't Op. at 19 (citing U.S. CONST. art. I, § 8, cl. 18 & art. II, § 2, cl. 2, and *Missouri v. Holland*, 252 U.S. 416, 432 (1920)), this "ill-considered *ipse dixit* that enables the fundamental constitutional principle of limited federal powers to be set aside by the President and Senate's exercise of treaty power" has been called into question. *Bond*, 134 S. Ct. at 2102 (Scalia, J., concurring); *id*. at 2101 ("*Holland* places Congress only one treaty away from acquiring a general police power," though "[t]he Necessary and Proper Clause cannot bear such weight.").

Third, even if the treaty clause could be considered to give rise to the authority to legislate, the requisite nexus between the treaty and § 2423(c) is missing. When the Necessary and Proper Clause is invoked, statutes implementing treaties replicate the treaty language of the

offense definitions contained therein or incorporate the treaty definitions by reference to the treaty. *See* Anthony J. Colangelo, *Constitutional Limits on Extraterritorial Jurisdiction, Terrorism and Intersection of National and International Law*, 48 HARV. INT'L L. J. 121, 187-201 (2007) (comparing U.S. laws with the treaties they implement). Indeed, to qualify as implementing legislation, an offense definition must "track the language of the [applicable] treaty in all material respects." *United States v. Belfast*, 611 F.3d 783, 804-05 (11th Cir. 2010).[2] Without this limitation, Congress could find a treaty to justify, at some high level of generality, anything Congress chooses to regulate, thereby vitiating the nature of Congress's power as limited and enumerated. Section 2423(c) neither identifies nor tracks the language of the Optional Protocol.

Moreover, § 2423(c) proscribes conduct that does not appear anywhere in the Protocol. The Protocol was concerned only with the commercial sexual exploitation of children and proscribes only commercial acts. There is nothing whatsoever in the Protocol about noncommercial sexual activity with a minor. And, significantly, "[s]ince the Protocol aims at punishing sexual abuse in the context of the *sale of children*, there is no obligation [under the Protocol] to criminalize consensual conduct involving individuals under age 18 that is legal under the laws of a State Party." S. Treaty Doc. No. 103-37, 2000 WL 33366017, at *15. By contrast, the laws of foreign countries are irrelevant to § 2423(c), and it is intended to reach non-commercial, consensual sexual conduct unrelated to the "sale of children." Since the purpose of the Optional Protocol is to combat the commercial effects of illicit sexual conduct with children

---

[2] The government's reliance on *Belfast*, Gov't Op. at 22-23, is misplaced precisely because the statute at issue there "track[ed] the language of the treaty in all material respects." 611 F.3d at 806 (quoting *United States v. Lue*, 134 F.3d 79, 84 (2d Cir. 1998)).

and the purpose of section 2423(c) is to reach non-commercial illicit sexual conduct, section 2423(c) is not "legitimately predicated on" the implementation of the Protocol. *Comstock*, 560 U.S. at 148. And Congress does not have inherent authority to invent new offenses under the Necessary and Proper Clause that were not contemplated by a treaty.

Lastly, section 2423(c) is not related to the Protocol because it does not prescribe conduct that is "domestically or transnationally" "obtaining . . . a child for child prostitution." S. Treaty Doc. No. 103-37, 2000 WL 33366017, at 8, 14-15. Rather, it prescribes conduct that is entirely intra-national. The government cites no support for its assertion that "[t]he requirement to cover offenses 'committed domestically or transnationally' is not narrowly confined to those who recently left their own nation for another." Gov't Op. at 21. And if, as the government says, "the Protocol calls on signatories to pass legislation covering all citizens and permanent residents—not just those who travel in foreign commerce," it does not, as the government contends, "create[] far-reaching obligations." *Id*. Indeed, Congress recognized that "U.S. extraterritorial jurisdiction based on nationality of the offender does not reach all offenses set forth in the Protocol," but reasoned that "[n]onetheless, since Article 4(2) is *permissive rather than obligatory*, U.S. law is consistent with the requirements of the provision." S. Treaty Doc. No. 103-37, 2000 WL 33366017, at *23 (emphasis added). Contrary to the government's assertion, U.S. criminal laws and the assertion of extraterritorial jurisdiction must be based on U.S. federal law and derive from a constitutionally authorized legislative power; they cannot rely entirely on permissive authority purported to arise from a treaty. Gov't Op. at 21. In sum, § 2423(c) is not, as the government suggests, independently supported by Congress's power to implement treaties to which the United States is a party.

Next, the government seems to suggest that because Mr. Park did not renounce his citizenship, the United States government can regulate anything he does anywhere he goes under the "plenary powers over citizens and foreign affairs." (Gov't. Op. at 25). The government argues that "the power of the United States to criminalize extraterritorial acts of its nationals is inherent in sovereignty, and stands apart from powers enumerated in the Constitution." Gov't Op. at 25. There is nothing in the Constitution that grants Congress such broad powers.

Notably, although the government contends that the United States has this blanket regulatory authority over U.S. citizens that originates outside of the Constitution, it invites this Court not to rely on it but, rather, just to consider it. Gov't Op. at 31. This purported extra-constitutional regulatory authority would import a host of problems and is unsupported by the law. Congress has no extra-constitutional power "inherent in sovereignty" to criminalize the extraterritorial acts of U.S. citizens. Citizenship is not a source of congressional legislative power, and the Supreme Court has never so held. The case on which the government relies, *United States v. Blackmer*, 284 U.S. 421 (1932), does not stand for that proposition. *Blackmer* addressed a U.S. citizen's challenges under the Due Process Clause and Fourth and Sixth Amendments to the issuance of subpoenas requesting that the citizen, who was living in France, appear in U.S. court, as well as challenges to the resulting contempt order for the citizen's failure to respond to the subpoenas. 284 U.S. at 433, 435, 441-42. There was no question that Congress had the power to enact a statute requiring the U.S. citizen to appear in U.S. court "by virtue of the legislative power to prescribe the [civic] duties of the citizens of the United States" and there was no question "that one of the duties which the citizen owes to his government is to support the administration of justice by attending its courts and giving his testimony whenever he is properly summoned." *Id*. at 438. The case did "not present the questions which arise in cases

where obligations inherent in allegiance are not involved." *Id*. at 438 n.5. Rather, *Blackmer* concerned objections to the judicial application and enforcement of an admittedly constitutional U.S. law. *Id*. at 448-49. By contrast, here, Mr. Park challenges Congress's power to enact § 2423(c) in the first place, not U.S. *in personam* jurisdiction over him or the statute's extraterritorial reach (which is a question "of construction, not of legislative power"). *Id*. at 437.[3]

For this same reason, the other cases cited by the government are inapposite. Gov't Op. at 27-28. Those cases all concern the extraterritorial reach of a constitutionally valid exercise of Congressional legislative authority. By contrast, this case concerns an invalid, unconstitutional statute. The statute's extraterritorial reach is immaterial.

The government also suggests that § 2423(c) is constitutional based on Congress's inherent power to legislate in external affairs and matters touching on foreign affairs. Gov't Op. at 28. But accepting this argument would mean that Congress has a plenary police power over all U.S. citizens abroad, a power not contemplated by the Constitution. *Cf. Ex parte Quirin*, 317 U.S. 1, 25 (1942) ("Congress and the President, like the courts, possess no power not derived from the Constitution."). Additionally, there is no binding precedent supporting such a plenary international police power and such a power would effectively render Congress's power under the Foreign Commerce Clause meaningless.

The United States Constitution prohibits Congress from enacting any "ex post facto Law." U.S. CONST., art. I, § 9. An ex post facto law is one which "makes an action, done before

---

[3] Also, the *Blackmer* Court noted that contempt proceedings, unlike § 2423(c) prosecutions, are "regarded as sui generis and not 'criminal prosecutions' within the Sixth Amendment or common understanding.'" *Id*. at 440 (citation omitted).

passing of the law, and which was innocent when done, criminal." *Calder v. Bull*, 3 U.S. 386, 390 (1798). The amendment to § 2423(c) which purports to criminalize, in part, Mr. Park's lawful residence in Vietnam was enacted more than a decade after Mr. Park had left the United States. Thus, applying the 2013 amendment to his alleged conduct here violates the ex post facto clause.

Finally, while there is generally no bar to the extraterritorial application of United States criminal laws, *United States v. Felix-Gutierrez*, 940 F.2d 1200, 1204 (9th Cir. 1991), such application must be lawful and reasonable. "[I]n the absence of an explicit Congressional directive, courts do not give extraterritorial effect to any statute that violates principles of international law." *United States v. Vasquez-Velasco*, 15 F.3d 833, 839 (9th Cir. 1994). "[A]n exercise of jurisdiction [even if it is otherwise consistent with international law] still violate s international principles if it is 'unreasonable.' *Id.* The application of this statute to Mr. Park was unreasonable because there was no link to the territory of the United States, there was no link between the actions of Mr. Park and the protectees of the United States, and the actions alleged were not necessarily illegal in the territory where they occurred. (Vietnam had already investigated and determined there was no cause for prosecution – as the government concedes, Mr. Park was excluded due to a problem with his visa, not for criminal behavior).

In sum, because Congress acted beyond the enumerated powers given to it under the Constitution when it enacted § 2423(c), because no other constitutional grant of authority empowers Congress to reach the conduct at issue in this case, and because the application of the statute to Mr. Park's conduct is not reasonable, the indictment must be dismissed.

Respectfully Submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____"/s/"_____
MICHELLE PETERSON
Assistant Federal Public Defender
625 Indiana Ave., NW   Ste. 550
Washington, DC   20004
(202) 208-7500
shelli_peterson@fd.org