UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CASE. NO. 1:16-cr-00009-TSC |
| | : | |
| JOSEPH RICKY PARK, | : | |
| | : | |
| Defendant. | : | |

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S
### REQUEST FOR REVIEW OF ORDER OF DETENTION

The United States of America, by and through the undersigned attorneys, respectfully opposes the Defendant's request for review of the order of detention in this matter. Docket (D.) 58. In support of this motion, the United States argues that there are no set of conditions that are adequate to protect the community and to ensure the defendant does not flee; that the defendant has failed his burden of production; and that the mere possibility of contraction of COVID-19 is not a change in circumstances that necessitates revisiting the initial detention order.

### PROCEDURAL HISTORY

Joseph Ricky Park ("Defendant") is a twice convicted child sex offender who is currently accused of molesting a child and producing child pornography depicting other children, and attempting to do so. On January 13, 2016, the Defendant was charged by indictment with engaging and attempting to engage in illicit sexual conduct with a minor in a foreign place in violation of 18 U.S.C. § 2423(c) and (e). D. 2. On February, 17, 2016, after an oral motion from the United States, the Court ordered the Defendant to be detained pending trial pursuant to 18 U.S.C. § 3142. D. 4.

In its ruling, among other things, the Court noted that over the past three decades, the Defendant has shown "repeated and systematic sexual abuse of children in multiple countries." *Id*. at 4. The charges in the case reflect "society's view that crimes involving the sexual abuse of minors are some of the most heinous and dangerous federal crimes." *Id*. In addition, the weight of the evidence favors detention. *Id*. at 5. Noting that the defendant had been deported multiple times from several countries due to allegations of sexual misconduct with children, the Court also emphasized that the Defendant has no job, residence, or other ties to any community in the United States. *Id*. Indeed, the Defendant has not so much as passed through the United States in 15 years and has no relatives in the area of the District of Columbia. *Id*. at 2 (noting the Defendant's suggestion that he live with a sister in New York). As the Court said, "Defendant appears to live without borders and is indiscriminate in his search for his next victims ... Defendant engages in a cycle of preying upon and abusing children who trust that he will provide them with an education and only stops when he is discovered and deported ... Looking at the Defendant's history of systematic sexual abuse of minors, it is clear he poses a serious threat to children." *Id* at 5. Lastly, the Court found that the Defendant was a flight risk. *Id*. at 6. For those reasons, the Court ordered that the Defendant be detained pending trial. *Id*.

On February 28, 2018, the Court dismissed the indictment, finding the statute to be unconstitutional as applied to the Defendant. D. 35 and 36. The United States filed a Notice of Appeal, and moved to continue detention of the Defendant pending appeal. D. 37, 38, and 39. The Defendant filed a motion to be released. D. 42 and 43. On March 14, 2018, the Court ordered the defendant to be detained pending appeal for the reasons set forth by the court in the Detention Memorandum filed on February 17, 2016 (D. 4). D. 44.

In February, 2019, the Defendant filed two letters, D. 47 and 48, seeking a court order releasing him on bond and directing the U.S. Marshals to transfer him to the Correctional Treatment Facility in Washington, D.C. in the interim. The government filed a response opposing both requests. D. 49. On April 25, 2019, for the reasons set forth by the Court in the February 17, 2016, Detention Memorandum, the Court again denied the Defendant's motion for release or a bond reconsideration hearing. The Court also denied the transfer motion, because the housing of defendants is left to the sound discretion of the U.S. Marshals.

On November 5, 2019, the Court of Appeals for the District of Columbia issued its mandate reinstating the indictment. D. 52. Since then, the parties engaged in plea negotiations, and are likely near an agreement.

On March 30, 2020, the defendant filed the instant motion for review of the defendant's order of detention, citing the outbreak of COVID-19 in the Washington, D.C. area as the changed circumstances requiring review. (Amended as D. 58 on March 31, 2020).

## **ARGUMENT**

A defendant must be detained pending trial if the Court determines that no condition or combination of conditions "will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e). A court may reconsider its decision regarding pretrial detention "at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time and that has a material bearing on the issue" of whether there exist conditions for release that would "reasonably assure the appearance of such person as required." *United States v. Bikundi*, 73 F. Supp. 3d 51, 54 (D.D.C.

2014) (citing 18 U.S.C. § 3142(f)(2)(B); accord *United States v. Moore*, No. 13–330, 2014 WL 1273439, at *1 (D.D.C. Mar. 31, 2014)).

The touchstone of this analysis, even under reconsideration, is still whether there are conditions of release that will reasonably assure the appearance of the Defendant as required and the safety of any other person and the community. Because the Defendant was indicted for sex crimes involving children, there is a rebuttable presumption under 18 U.S.C. §§ 3142(e)(2) & (3)(E) that the Defendant constitutes a danger to the community, and that no pretrial release condition or combination of conditions may be imposed to assure the safety of any other person and the community. *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996) (indictment establishes probable cause to believe the defendant committed the triggering offense). This presumption "operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985).

In determining whether the Defendant has overcome the presumption, the Court must consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g).

Even when the defendant has offered evidence to rebut the presumption of dangerousness, the presumption remains a factor in the court's analysis of the § 3142(g) factors. *See United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1983) ("Use of that word [rebutted] in this context is somewhat misleading because the rebutted presumption is not erased. Instead it

4

remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g).").  As the Sixth Circuit has observed, "[t]he presumption [of dangerousness] remains as a factor because it is not simply an evidentiary tool designed for the courts.  Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." *United States v. Stone*, 608 F.3d 939, 945-46 (6th Cir. 2010) ("To rebut the presumption, therefore, a defendant should 'present all the special features of his case' that take it outside 'the congressional paradigm.'").  *See also United States v. Ali*, 793 F. Supp. 2d 386, 388 (D.D.C. 2011); *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991).

In this case, even in light of the outbreak of COVID-19 in the Washington, D.C. area, there is no condition or combination of conditions that will reasonably assure the safety of the community if the Defendant is released, nor that he does not flee.

**I.    The Bail Reform Act factors, considered by the Magistrate Court in the original detention determination, remain in favor of detention.**

On February 12, 2016, following the Defendant's arrest in this matter, the United States orally moved for the Defendant to be detained pending trial pursuant to 18 U.S.C. § 3142(e)(3)(E).  The Court ordered that the Defendant be detained, and reaffirmed its ruling twice over the pendency of the case.  D. 4, D. 44, Order entered April 25, 2019.

The Defendant now again seeks release.  He invokes COVID-19, but again offers no new evidence to negate his dangerousness nor any evidence as to how his release into home confinement (even if practicable) would protect the community given the Defendant's repeated convictions for child sex offenses and lack of ties to the community.

To determine whether the Government has met its burden, the Court must consider the available information concerning (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the Defendant; (3) the Defendant's history and characteristics, including the Defendant's ties to the community; and (4) the nature and seriousness of the danger to any person or to the community which would be posed by the Defendant's release. 18 U.S.C. § 3142(g). If a judicial officer finds by clear and convincing evidence that "no condition or combination of conditions will reasonably assure . . . the safety of any other person and the community, such judicial officer shall order the detention of the [defendant] before trial." 18 U.S.C. § 3142(e).

Respectfully, in this case, even in light of the outbreak of COVID-19 in the Washington, D.C. area, these factors support continued detention, as the Court has repeatedly concluded. D. 4, D. 44, Order on April 25, 2019. No set of conditions of release would be adequate in light of the collective impact of:

> the nature of the charges in this case, which involve multiple instances of sexual exploitation implicating several children, *see* D. 22;

> the Defendant's lifetime of committing child sexual abuse—whether it results in conviction or deportation, his abusive conduct has not abated since his first conviction over 30 years ago; and

> his global nomadic lifestyle that has left him with minimal personal ties in the United States.

This Court has properly denied the Defendant's repeated requests for release because the "Defendant appears to live without borders and is indiscriminate in his search for his next victims ... Defendant engages in a cycle of preying upon and abusing children who trust that he will provide them with an education and only stops when he is discovered and deported ... Looking at the

6

Defendant's history of systematic sexual abuse of minors, it is clear he poses a serious threat to children." D. 4 at 5. The Court has also correctly ordered the Defendant be detained because he "has no job, residence, or other ties to any community in the United States," *id.*, and had not been in the United States in the fifteen years prior to his arrest. In short, given the nature of the charges and the Defendant's unique history, he is a wholly unsuitable candidate for release.

Even if the Court were to consider the Defendant's motion, it should be denied because the Defendant has failed to meet his burden of production that conditions of release are adequate to ensure the Defendant is neither a danger to the community nor a flight risk. The only conditions proposed by the Defendant are home arrest with a purported friend in Philadelphia, combined with ankle monitoring. D. 58 at 19-20. Other than indicating that this friend lives alone and has no criminal history, the Defendant provides the Court with no other information (to include how he knows this friend, how long the friend is willing to house the Defendant, whether the friend lives near children, and what internet-enabled devices are in the home and how they might be restricted). The Defendant does not address how he would get to or from Philadelphia or how he would participate in court hearings through telephone or video conference, nor how he would receive medical care if necessary. Most importantly, he does not confirm that ankle monitoring will be available and effective outside of the District of Columbia in light of increased demand and any impact of COVID-19 on the personnel needed to implement ankle monitoring. *See United States v. Martin*, 2020 WL 1274857, *4 (D. Md. March 17, 2020) (GPS monitoring "is not a limitless resource, nor its installation and monitoring by United States Pretrial Services officers without risk to those personnel . . . given the current recommendations regarding implementation of social distancing."). *See also United States v. Lewis*, 19-cr-34-LMA-MBN (March 19, 2020 E.D. La.)

7

("If anything, the COVID-19 pandemic has reduced the availability of conditions to mitigate the risk to the community"). The need to ensure the efficacy of ankle monitoring is particularly important since it would be impossible for this friend to supervise the Defendant for 24 hours a day, seven days a week. As such, if the Court were to consider the Defendant's motion for release, it should be denied since the Defendant fails to propose an adequate alternative.

Finally, the United States notes that if the Defendant were to plead guilty, then release would no longer be an option. Section 3143(a)(2) of Title 18, United States Code, requires the Court to detain defendants convicted of certain crimes pending sentencing: "the judicial officer *shall* order that a person who has been found guilty of an offense described in subparagraph (A), (B), or (C) of subsection (f)(1) of section 3142 and is awaiting imposition or execution of sentence be detained" (emphasis added). Subparagraphs 3142(f)(1)(B) and 3142(f)(1)(C) do not apply to this case, as the former applies to offenses with a possible sentence of life imprisonment or death, and the latter applies to drug offenses with a sentence of imprisonment of ten years or longer. However, subparagraph 3142(f)(1)(A) refers to "a crime of violence", which is defined at 18 U.S.C. § 3156(a)(4) to include any felony described in Chapter 117. In this case, the Defendant is charged with violating 18 U.S.C. § 2423(c), which is contained in Chapter 117. There is no exception of which the United States is aware, either in the statutes or case law, to the mandatory detention post-conviction of defendants convicted of committing illicit sexual conduct with children abroad. Therefore, under a plain reading of the statutes, the Court is *required* to detain the Defendant upon his guilty plea.[1] Since the parties reasonably expect the

---

[1] Section 3143(a)(2) provides one exception to the mandatory detention provision if the Court finds that (A) either there is a substantial likelihood that a motion for acquittal or new trial will be granted or that the United States recommends that no sentence of imprisonment be

8

Defendant to plead guilty in a matter of weeks, releasing him at this juncture would accomplish little since he would shortly have to be taken into custody again. A better course of action would be to resolve the prosecution as expeditiously as possible.

**II.    While the COVID-19 pandemic is dangerous, it is not a changed circumstance that warrants reconsideration of bond in this particular case.**

COVID-19 is a dangerous global pandemic that continues to grow rapidly and clearly presents serious and evolving risks. However, it should not now be viewed as a changed circumstance sufficient in every case to reverse the bond determination such that it leads to the wholesale release of all defendants, including all violent offenders such as Mr. Park. In this particular case, where the Defendant represents a substantial danger that would not be sufficiently mitigated by home confinement, it is not a sufficient changed circumstance.

The United States Attorney's Office has been in consultation with the D.C. Department of Corrections (DOC) to obtain relevant information as to its handling of the public health crisis, and the office continues to get daily updates. The office understands that there are differing viewpoints regarding the DOC's actions, including those expressed by the Defendant and the Fraternal Order of Police. However, as of March 27, 2020, according to DOC, DOC has done the following to ensure the safety of its incarcerated population: (1) banned all non-attorney visits to limit unnecessary exposure; (2) implemented screening processes for all visitors and incoming inmates, including attorneys and staff; such screening includes assessing visitors and inmates for symptoms,

---

imposed, and (B) that there is clear and convincing evidence that the defendant is not likely to flee or pose a danger to another person or the community. The use of the word "and" in Section 3143(a)(2) indicates that both subsection (A) and (B) must be satisfied in order to grant release pending sentencing). In the event of a plea, the conditions of subsection (A) cannot be met. Therefore, this exception does not apply. Further, given the Defendant's history, the conditions of subsection (B) cannot be met.

9

sanitizing stations, etc.; (3) if incoming residents at a DOC facility fail the screening process, they are given a mask and taken to medical to determine if they require further hospitalization or testing. Moreover, if there is concern that an inmate has COVID-19, the inmate will be placed into a single cell in a specialized unit, where the inmates only contacts are with medical staff, who will obtain COVID-19 testing within 3-4 days; (4) DOC has implemented an incident command program, where each day, DOC units meet to discuss ongoing processes to combat the virus; (5) DOC sends out daily reminders to its staff about taking preventative, prophylactic measures to avoid infection, such as washing hands, using sanitizer, etc.; (6) DOC has constant meetings with the D.C. Department of Health to ensure its procedures meet both local and national standards, to include following updated recommendations of the Centers for Disease Control; (7) DOC has continued to engage with the USAO and the local Public Defender Service to ensure continuity of operations; (8) DOC checks and rechecks its ventilation system to ensure the air quality in the facilities; (9) DOC is tracking and ordering additional cleaning and sanitation kits (for example, as of March 17, 2020, the D.C. jail had 55,200 bars of fresh soap, which it dispenses weekly to each inmate), as well as protective gear and it has mandated cleaning at its facilities every two hours; (10) DOC would like to limit the number of inmates coming into its facility at any given time; and (11) DOC has the capacity to quarantine a number of inmates (it was previously suggested around 100 inmates), but that number is fluid and changing.

The Government is aware that as of March 30, five inmates have tested positive or presumptive-positive for COVID-19. It is our understanding that they are each being monitored and isolated. Moreover, DOC's medical department and Unity Medical Care will continue working with D.C. Health on contact tracing to protect the health and wellbeing of DOC's inmates.

DOC has previously handled possible COVID-19 cases with similar procedures.[2] The government anticipates that more could test positive over time within the facilities, even with CDC-level precautions taken. Sadly, as this Court is likely well aware, the possibility of COVID-19 – a global pandemic – reaching the DOC was always a realistic possibility. It is now incumbent on the government and the Court to balance the security and safety of the community with the safety of the Defendant. Here, the Defendant claims that the existence of COVID-19 necessitates wholesale release. That simply cannot be.

As defendants continue to ask for release based on COVID-19, courts in this district have begun to assess the validity of these widespread claims.[3] In *United States v. Hill*, 19-cr-260 (APM) (D.D.C.), the defendant filed a motion for release. The Court denied the defendant's motion for release, without a hearing, noting:

> Defendant's release would present a danger to the community and that there is no condition or combination of conditions that would reasonably assure the community's safety. Although the court recognizes the danger presented by the coronavirus outbreak, and that older populations are more vulnerable, on balance release is not warranted at this time. The Department of Corrections is taking precautions to protect the inmate population, and there is not any reported case

---

[2] The Defendant points to the fact that a single Deputy United States Marshal tested positive for COVID-19. As a result of this positive test, DOC followed its protocols outlined above. For example, every inmate who might have been exposed to the deputy was placed in quarantine. Of the quarantined inmates, a single inmate became symptomatic, and later tested negative for COVID-19. The remaining inmates nevertheless remained in quarantine to protect the remainder of DOC's population, until medical officials permitted release of the quarantine. The remaining inmates were not tested, but assessed for symptoms, and DOC followed D.C. Department of Health guidelines. Thus, DOC is continuing to ensure its employees and its inmates' safety.

[3] On March 25, 2020, Judge Amy Berman Jackson released a defendant pursuant to the §3142 factors, but noted that "[i]n light of the Court's decision to grant the motion based on the application of the Bail Reform Act and Circuit precedent, it is not necessary to address whether and how the potential impact of the Coronavirus on the jail population should factor into the analysis." *United States v. Lovelace*, 20-cr-54 (ABJ) (Mar. 25, 2020 D.D.C.) (ECF No. 38, at 12 n.5).

> within the inmate population (to the court's knowledge). The court is prepared to reconsider this order should conditions change at the jail.

*Id.,* Minute Order, March 19, 2020. In *United States v. Smith*, 19-cr-324 (BAH) (March 23, 2020), U.S. District Court Chief Judge Beryl A. Howell – the same judge that issued Standing Order 20-9 that suspended most courthouse operations as a result of the pandemic – remarked that while "[t]he risk presented by the pandemic is serious, and the Court acknowledges that risk may be greater in a jail environment . . . ." But the Court also noted that:

> [T]he D.C. Department of Corrections has taken aggressive precautions to prevent the spread of the virus within the facility where defendant is detained . . . including suspending all in-person visits, programming, and volunteer activities within its facilities, enhanced cleaning efforts, especially within common areas, and vigilant medical personnel on alert for symptoms and prepared to isolate and treat symptomatic residents, *see* Department of Corrections Notice, Updated: March 14, 2020, available at https://doc.dc.gov/page/coronavirus-prevention. Although defendant is in an age group that may be more susceptible to the virus . . . this risk pertains whether the defendant were released or detained, and any heightened risk posed by pretrial detention does not outweigh the presumption in favor of detaining the defendant pretrial, nor does it alter the balance of the statutory factors Congress prescribed for determining the propriety of detention, which all continue to weigh heavily in favor of detention.

*Id.* There is no reason to suggest that in several days, despite the existence of positive tests, that DOC has abandoned its protocol and seeks to endanger its inmates.[4] *See also United States v. Jacob Jordan*, 20-cr-55 (TFH) (March 23, 2020 D.D.C.) (acknowledging the risks associated with COVID but denying release); *United States v. Gonzalez*, 20-cr-40 (BAH) (March 24, 2020 D.D.C.) (denying release, noting the steps taken by DOC); *United States v. Antonio Tabron and Lamont*

---

[4] On March 26, 2020, in *United States v. Kofi Appiah and James Hutchings*, 19-cr-361 (BAH), the Court released both defendants, noting that one of the defendants had no criminal history and an underlying medical condition, whereas the other defendant was injured in a jail-related assault that necessitated release. The Court also noted that there was no rebuttable presumption in that case.

12

*Johnson*, 18-cr-112 (TFH) (denying release after trial); *But see United States v. Harris*, 19-cr-356 (RDM) (March 26, 2020) (releasing defendant in part because of COVID-19 pandemic).

Opinions filed in neighboring districts are in accord.[5] On March 17, 2020, Judge Paul Grimm of the U.S. District Court, Maryland, issued a written memorandum opinion on this very issue. *United States v. Martin*, 2020 WL 1274857, *2 (D. Md. March 17, 2020). Noting, appropriately, that the Court "takes this [COVID-19] health risk extremely seriously," the Court nevertheless recognized that "resolving . . . an order of detention must in the first instance be an individualized assessment of the factors identified by the Bail Reform Act." *Id.* at *3. In addressing the new issue raised by the defendant – COVID-19 – the Court nevertheless found that the defendant's health (his asthma, high blood pressure, and diabetes) was "insufficient to rebut the proffer by the Government that the correctional and medical staff at [the local detention facility] are implementing precautionary and monitoring practices sufficient to protect detainees from exposure to the COVID-19 virus." *Id.* at *4. Finally, the Court questioned the defendant's proposed use of GPS location monitoring even if the defendant were released subject to conditions, finding that such monitoring "is not a limitless resource, nor its installation and monitoring by United States Pretrial Services officers without risk to those personnel . . . given the current

---

[5] *But see United States v. Stephens*, 15-cr-95-AJN (March 19, 2020 S.D.N.Y.) (COVID-19 outbreak and as well as a change in the facts of the case – a possible misidentification by an eyewitness – necessitated release). In choosing to release the defendant, the Court noted the defendant's lack of a violent record, the weakened state of the government's evidence, the failure of the local jail to arrange legal calls in preparation of his defense, and the effective ban on legal visits with limited exceptions as bases to implement release conditions. *Id.* Notably, the Court recognized that its decision cannot be made simply because of COVID-19. *See id.* at *6 n.3 ("The Court need not decide this additional factor [the current public health crisis] here because its determination that release is necessary for the preparation of the Defendant's defense is sufficient under § 3142(i)."

recommendations regarding implementation of social distancing." *Id.*; *see also United States v. Lewis*, 19-cr-34-LMA-MBN (March 19, 2020 E.D. La.) ("If anything, the COVID-19 pandemic has reduced the availability of conditions to mitigate the risk to the community"). As in *Martin*, the Defendant's preexisting health conditions do not warrant release.

In fact, the District of Maryland, Greenbelt Division, has almost uniformly denied such petitions on similar, generalized grounds. *See, e.g.*, *United States v. Adams*, 19-cr-257-003, at *3-4 (DKC) (March 25, 2020 D. Md) (COVID-19 is not the "kind of extraordinary reason for Mr. Adams' release. The correctional and medical staff at detention facilities continue to provide appropriate safeguards for health and safety of those committed to their custody."); *United States v. Bilbrough, IV*, 20-cr-33, at *4-5, 7 (TDC) (March 20, 2020 D. Md) ("D.C. Department of Corrections appears to be taking reasonable steps to prevent and combat the spread of COVID-19 in its facilities. Although [the defendant] may still be at an increased health risk [from diabetes] . . . this factor alone does not outweigh the other factors."); *United States v. Brown*, 16-cr-553 (RDB) (March 26, 2020 D. Md) (denial of release from BOP custody); *United States v. Jefferson*, 19-cr-487 (CCB) (March 23, 2020 D. Md) ("Precautionary measures have been implemented at CTF in light of the COVID-19 pandemic" denying release to an asthmatic defendant); *United States v. Johnson*, 17-po-9262 (TMD) (March 20, 2020 D. Md) (discussing general risk of exposure to COVID-19, but denial of release on other grounds); *United States v. Jones*, 17-cr-582, at *2 (CCB) (March 20, 2020 D. Md) ("CDF medical personnel are adequately addressing Defendant's medical needs" and the COVID-19 "risks are not the sole determinant of whether detention is appropriate."); *United States v. Legard*, 19-cr-137, at *2-3 (PWG) (March 24, 2020 D. Md) (Asthma was not a basis alone to release a defendant in light of COVID-19 pandemic and that the

measures at the D.C. jail are "in compliance with state and federal guidelines regarding protective measures"); *United States v. Parker II*, 18-cr-344, at *4, 8 (TDC) (March 21, 2020 D. Md) (discussing Deputy U.S. Marshal who tested positive for COVID-19, crediting the defendant's alleged health risks [prior aneurysm, prostate cancer, and present diabetes], and noted that the D.C. Department of Corrections "has implemented prophylactic and other measures in response to the COVID-19 virus."); *United States v. Perry*, 14-cr-181, at *1-2 (GLR) (March 26, 2020 D. Md) (denial of release from halfway house due to COVID-19, but on statutory reasons, but also noting that the affidavit of Dr. Marc Stern "lack[ed] the case or institution specificity to determine, with sufficient certainty, the health risks posed at the institution."). In fact, in *United States v. Williams*, 13-cr-544 (PWG) (March 23, 2020 D. Md), the Court even acknowledged that DOC has taken significant measures to stem the tide of the pandemic, but that "[s]hould the unfortunate event occur, the correctional authorities have in place a plan of action that should not be summarily embraced or discarded. Nor does it follow that a presumption of release materializes without more details about the impact upon [the defendant] directly." *Id.* at *5. Perhaps most explicitly, "[t]he existence of the present pandemic, without more, is not tantamount to a 'get out of jail free' card. Not even for the older person being detained." *Id.* The Court thus denied a 67-year-old defendant emergency release.

While the Defendant correctly points out that in *United States v. Harris*, Judge Moss of this Court did release the Defendant, that case is inapposite. In that case, the defendant was charged with distribution of child pornography, and not illicit sexual conduct with children. Moreover,

15

that defendant presented much less danger to the community, as, unlike Mr. Park, Mr. Harris did not have multiple prior convictions for child sex offenses.[6]

The United States appreciates the gravity of this global pandemic and is committed to ensuring the safety and health of inmates like the Defendant.[7] But at this stage and at this time, based on the information provided by DOC, DOC appears dedicated and willing to address this public health crisis.[8] Given that, as well as the facts of this case, which demonstrate the Defendant presents a clear danger to the community that would not be mitigated by home confinement, the Defendant should continue to be held pending trial.

**WHEREFORE**, for the foregoing reasons and for any other such reasons as may appear to the Court, the government respectfully requests that the Court deny the defense motion for review of the order of detention.

Respectfully submitted,

Steven J. Grocki
Chief
U.S. Department of Justice
Child Exploitation and Obscenity Section

---

[6] It is also worth noting that Mr. Harris had a ready-made place to stay within Washington D.C., and someone who could ensure he did not access the internet, something missing in this case.

[7] In fact, as this Court may be well aware, the government has meaningfully endeavored – on a case-by-case basis – to permit temporary release pursuant to 18 U.S.C. § 3142(i) to those who actually need release. This includes non-violent offenders who have verified serious health risk and are otherwise vulnerable. The pandemic, however scary, does not change the circumstances that led the government and the court to previously conclude that the offender represented a serious risk to the community. The government will continue to work with the defense bar to address those with health concerns.

[8] The U.S. Attorney's Office continues consulting with the DOC on a frequent basis in light of the rapidly-changing situation.

       /S/
ALEXANDRA R. GELBER
Deputy Chief
D.C. Bar 473773
U.S. Department of Justice
Child Exploitation and Obscenity Section
1400 New York Avenue, NW, Suite 600
Washington, D.C. 20530
202-307-1316
alexandra.gelber@usdoj.gov

       /S/
LAUREN S. KUPERSMITH
Trial Attorney
U.S. Department of Justice
Child Exploitation and Obscenity Section
1400 New York Avenue, NW, Suite 600
Washington, D.C. 20530
202-514-1564
lauren.kupersmith@usdoj.gov

Dated: **April 1, 2020**